Ex Parte Gloria Jean De Castro.—190 S. W. (2d) 949.

St. Louis Court of Appeals.  Per Curiam Opinion filed December 14, 1945.

1012

*Franklin E. Reagan* and *Sievers & Reagan* for petitioner.

*Hall & Reaban* for respondent.

BENNICK, C.—On October 26, 1945, the court, of its own motion, and by an order duly entered of record, referred this case to the undersigned as Commissioner of the court to hear the evidence, rule on all questions of law, and make a report to the court of his conclusions of law and fact, together with his recommendations. Pursuant to such order, the hearing was had and concluded; and the Commissioner's report is herewith submitted.

This is a proceeding in *habeas corpus* to obtain the custody of an infant child, one Gloria Jean De Castro, who at the time of the hearing before the Commissioner was two years and seven months of age. The contesting parties are the petitioner, Madelyn De Castro, the natural mother of the child, and the respondent, Theresa De Castro, the child's paternal grandmother.

The matters upon which petitioner and respondent join issue appear from respondent's first amended return and petitioner's answer thereto.

In such return respondent admitted that the child, Gloria Jean De Castro, was then in her custody, and alleged that the child was detained by her as paternal grandmother by virtue of a letter signed both by petitioner and by a deputy probation. officer of the Juvenile Court of the City of St. Louis.

Attached to the return as an exhibit (and thereby made a part of the return for all purposes, Laws 1943, p. 371, sec. 44, Mo. R. S. A., sec. 847.44) was a copy of the following letter, written on Juvenile Court stationery on November 8, 1943, addressed to respondent, and signed by Freda Hunt, deputy probation officer, and also by petitioner:

"This letter will give you temporary custody of the above named child, Gloria Jean De Castro. As you know the mother was in this office with you and she willingly consented to you having this child in your home as she is planning to live with an aunt, a Mrs. Jean Greer, 3325 Palmetta Drive, Tampa, Florida, until the father Emil De Castro returns from the Armed Forces."

For further return respondent alleged that she was detaining Gloria Jean "because petitioner is an unfit and immoral person and for that reason is not entitled to custody of said child, in this, to-wit: That petitioner, while married to the father of said child and while the said father was overseas in the Armed Forces of the United States, and before his death, committed incest by living and having sexual intercourse with her own father, Fairey Padgett, causing petitioner to become pregnant on or about July 1, 1943, by reason of said act or acts, and that petitioner has continued and is now living with said father in the City of Chicago, Illinois".

In her answer to the return, petitioner admitted the allegations of the return respecting the sending of the letter over the signature of Freda Hunt and herself purporting to award the temporary custody of Gloria Jean to respondent.

As for the charge that she had been guilty of incest with her father, Fairey Padgett; that she had become pregnant as the consequence of such conduct; and that she had continued to live and was now living with her father in Chicago, petitioner's answer was as follows:

"Petitioner denies the allegations set forth in Paragraph 2 of said first amended return and states the facts in connection with such allegations to be as follows: That on or about the 12th day of June, 1943, petitioner was criminally attacked by her father, Fairey Padgett, in their farm home about four miles from Waltersboro, South Carolina; that petitioner's mother, Eva Ray Padgett, was absent at the time and returned about one hour later; that petitioner immediately informed her mother of the occurrence and was never left alone with her father thereafter.

"Petitioner further denies that she became pregnant as a result of said attack and states that she has never been pregnant except by her husband, Emil De Castro, and then only with her daughter, the above named Gloria Jean De Castro.

"Petitioner further states that she left the home of her father and mother during the first week in July, 1943, and resided in Waltersboro, South Carolina, until the latter part of August, 1943; that on one occasion, about two weeks after she left home, her father accosted her in Waltersboro and threatened to kill her; that about two weeks thereafter, for the reasons aforesaid, petitioner's mother left the said Fairy Padgett and, on August 5, 1943, caused him to be arrested and placed under peace bond; that the said Fairey Padgett was detained and kept in jail until on or about August 10, 1943, at which time petitioner's mother obtained a legal separation from him; that petitioner last saw her father on August 5, 1943, the day of his arrest aforesaid and that she has not heard from him since said date.

"Petitioner further states that she left Waltersboro, South Carolina, in August, 1943, and went to live with the respondent, Theresa De Castro, in St. Louis, Missouri, where she remained until November, 1943; that from November, 1943, until January, 1944, she lived with her aunt, Mrs. Jean Greer, in Tampa, Florida; that from January, 1944, until May, 1944, she lived with her mother in Columbia, South Carolina; that from May, 1944, until September, 1944, she again lived with her aunt, Mrs. Jean Greer, in Tampa, Florida; that from September, 1944, until the present time, she has lived with her grandparents, Mr. and Mrs. Joseph Weyman, in Chicago, Illinois, and that her mother is now living with her in said home."

So much for the issues as made between the parties themselves by their respective pleadings in the case.

There is, however, a still further issue which inheres in the case by reason of its subject-matter. This is the issue of the welfare of the child, which is an issue always to be kept in view in all legal proceedings involving the custody and control of a minor child as to which the State stands in the relation of *parens patriae*. In other words, whenever a minor child is brought within the jurisdiction of a court for an adjudication with respect to the question of its custody, the child becomes the ward of the court; and in determining the question of its ultimate disposition, the child's well-being is of paramount consideration, and the rights and claims of the contending parties, even in the case of the parents themselves, must be subordinated to what the court may conclude will be for the best interests of the child. [Ex parte Badger, 286 Mo. 139, 226 S. W. 936.]

Nor does it affect the application of this doctrine that the proceeding in which the child's custody is in issue may be, as in this case, a proceeding in *habeas corpus,* which is basically and essentially a legal remedy. This for the reason that where the writ is availed of for such a purpose, the proceeding is not aimed at freeing the child from some illegal restraint or imprisonment as in the case of the ordinary issuance of the writ, but instead is directed towards securing an adjudication by the court upon the question of what will best promote the well-being of the child, whose custody must be vested in one person or another. In such an instance the nature of the inquiry makes the proceeding one of an equitable nature; and the question of either party's strictly legal right will be measured in terms of the welfare of the child. [Ex parte Badger, *supra*; 25 Am. Jur., Habeas Corpus, secs. 78-80; 39 C. J. S., Habeas Corpus, sec. 41.]

While the above undoubtedly reflects the general law regarding the scope of the inquiry in a *habeas corpus* proceeding for the determination of the right to the custody of a minor child, it may be questioned whether, by force of statute or rule of decision in this State, the court's jurisdiction in such matters has been limited so that in a controversy between the natural mother on the one hand and one other than the father on the other, the mere fact of the petitioner's status as natural mother would entitle her to custody as a matter of course, and preclude any investigation into her personal fitness as the same might affect the welfare of the child.

So far as any statute is concerned, the Commissioner has in mind Section 1659, Revised Statutes Missouri 1939, Missouri Revised Statutes Annotated, section 1659, which provides that if, in any *habeas corpus* proceeding "instituted between husband and wife" for the custody of their children under the age of fourteen years, it shall appear that the party against whom the complaint is brought is unfit to have the care and government of the child or children in controversy, it shall be lawful for the court to award custody to the

complainant or other guardian as shall be deemed best in the premises, and to make such other orders touching the custody and control of such child or children as the court may deem proper.

While the section authorizes the court to award the child's custody to the complainant or other guardian "as shall be deemed best in the premises", and in this respect undoubtedly contemplates that in making the award the court shall be motivated by due regard for the welfare of the child, it may be argued that inasmuch as the section is expressly limited in its application to *habeas corpus* proceedings "instituted between husband and wife", it thereby preempts the field of *habeas corpus* in child custody cases, and excludes the court's right to consider the question of the parent's fitness in its relation to the welfare of the child in any proceeding other than one which is "instituted between husband and wife".

The context of Section 1659 would seem to indicate that the Legislature, in its enactment, was not in anywise assuming to limit the broad powers of the courts on *habeas corpus* in child custody cases, but was rather undertaking to give statutory recognition to powers already existing, and in fact to add to those powers, in the field of proceedings "instituted between husband and wife". Especially was the latter true with respect to the concluding provision of the section that instead of the court's jurisdiction being terminated with the execution of its order awarding custody to whomsoever it might select as the proper person to have the child, its order should be valid and remain in force for any period the court might fix during the minority of the child, and any person at any time violating such order might be dealt with summarily for contempt. The section was designed to invest the court with a greater latitude of power in proceedings "instituted between husband and wife"; but as to cases not brought between husband and wife, the section is wholly without application. [In re Waller (Mo. App.), 234 S. W. 866.]

As a matter of fact, no statute could effectively serve to curtail or restrict the power of the court in the issuance and determination of writs of *habeas corpus*. This for the reason that the source of the court's power in such respect has always been by constitutional grant, which has invariably been given without qualification or restriction. It is true that the Legislature may prescribe reasonable regulations of practice for *habeas corpus* cases so long as such regulations do not impair the efficiency of the writ, but no act could be recognized or regarded which purported to limit or cut down the unrestricted power conferred by the organic law itself. [Child Saving Institute v. Knobel, 327 Mo. 609, 37 S. W. (2d) 920; Ex Parte Hagan, 295 Mo. 435, 245 S. W. 336.] It is enough to say of the section in question that it in nowise offends in this respect.

But even though there is no statutory obstacle standing in the way of the court to consider the subject of the parent's fitness in a pro-

ceeding between the parent and some third person in temporary possssion of the child, a further doubt has been cast upon the question by virtue of two decisions of the Supreme Court, namely, Rochford v. Bailey, 322 Mo. 1155, 17 S. W. (2d) 941, and State ex rel. v. Alford, 343 Mo. 576, 122 S. W. (2d) 905.

The first case was a proceeding in *habeas corpus* in the Supreme Court; the second, a proceeding in *certiorari* to review the record of the Hannibal Court of Common Pleas in a *habeas corpus* case determined in that court. In each of the *habeas corpus* cases the writ had been issued upon the petition of the natural mother of the child in controversy, and in each instance was directed to respondents who claimed the right to the custody of the child as adopting parents under and by virtue of a decree of adoption which had been entered in the one case by the Circuit Court of Jackson County, and in the other by the Hannibal Court of Common Pleas. The present difficulty arises from the fact that in each of such proceedings the Supreme Court had the following to say: "In this connection it may be well to observe that the petitioner's financial ability to support her child and her moral fitness to be intrusted with its care and custody may not be questioned for any purpose of this proceeding."

There is no doctrine better settled than that the language used by a court in its opinion must be read and interpreted in the light of the facts and issues with which the court was concerned in the particular case.

In each of the cases in the Supreme Court in which the court excluded any consideration of the natural mother's financial ability and moral fitness, the *habeas corpus* proceeding had constituted a collateral attack upon a decree of adoption which had been rendered in a prior adoption proceeding. Such an attack was proper in a *habeas corpus* proceeding, assuming that the decree was absolutely void; but with that the basis for the issuance of the writ, it meant that the only issue to be determined was the question of the validity of the adoption decree. If the decree was absolutely void, then the petitioner, as the natural mother of the child, was entitled to its custody as against the respondents who based their right wholly upon their alleged status as adopting parents; while if the decree was valid, the effect of its rendition had been to terminate all the legal rights and relationships existing between the petitioner and her child, and to confer upon the respondents all the rights of natural parents. In other words, if the decree was valid, no fitness of the petitioner could have served to invalidate it, nor if it was for any reason invalid, could any lack of fitness on her part have served to validate the decree. In either event, its validity was to be determined by the question of whether the adoption statutes had been complied with so as to have invested the court with jurisdiction; and so the Supreme Court, addressing itself to such limited issue, very properly

held that the petitioner's financial ability and moral fitness were not to be questioned "for any purpose of this proceeding". Further than this the court did not go; and there is nothing to indicate that the court was intending to depart in the least from the equitable doctrine of the Badger case, that in a proceeding presenting the situation of the case at bar, the matter of the natural parent's personal fiitness is inherently a legitimate subject of inquiry in its relation to the question of the welfare of the child.

It was with the scope of the inquiry thus defined that the Commissioner heard the evidence in the case, about much of which there was no dispute.

Petitioner, Madelyn De Castro, the mother of the child, is now twenty years of age, and is the daughter of Fairey and Eva Padgett, who formerly lived together as husband and wife on a farm located some four miles out from Waltersboro, South Carolina. In addition to petitioner, the Padgetts had four other children, including three sons, one older than petitioner, who is now in the army, and two younger than petitioner, who are now residing somewhere in South Carolina. The fourth child was unaccounted for except that it was no longer a member of the Padgett household during the period of time involved in this proceeding.

Respondent, Theresa De Castro, the child's paternal grandmother, resides with her husband and two daughters at 538 Fassen Street, in the City of St. Louis. One daughter is nineteen and the other twelve years of age. A son, Emil, the husband of the petitioner, and the father of the child in controversy, was killed in Italy on January 20, 1944, while on active service with this country's armed forces during the late war.

In 1942 petitioner was employed as a waitress in the Greyhound Bus Station in Waltersboro, and in some manner became acquainted with Emil De Castro, who had been inducted into the army and assigned to the air corps, and was then stationed at an air field in the general vicinity of Waltersboro. The acquaintance ripened into a courtship, and culminated in their marriage on October 1, 1942.

After their marriage, petitioner remained in Waltersboro except for week-ends, which she would spend with her husband in Greenville, South Carolina. In October, 1942, shortly after the marriage, respondent visited the young couple in Greenville on the occasion of Emil's birthday. This was seemingly her first acquaintance with petitioner; and then at Christmas, 1942, petitioner and Emil visited at respondent's home in St. Louis. Emil's leave was for only a couple of days, but petitioner extended her visit somewhat longer, after which she returned to Waltersboro, where she last saw her husband in January, 1943, at the time he was ordered overseas.

Gloria Jean, the child in controversy, was born in Waltersboro on March 29, 1943. According to petitioner's own testimony, the delivery

of the child was brought about prematurely upon the advice of her attending physician that her physical conformation was such that if she were allowed to carry the child for the normal period of gestation, it would probably result in petitioner's death. Respondent does not admit that the baby was born prematurely, but does admit that her son, Emil, was its father, and in fact specifically alleges in her return that she is now detaining the child as its paternal grandmother.

After Gloria Jean's birth, petitioner remained in the hospital for two weeks, and then after a month with her parents on the farm, left the baby in her mother's care, and returned to Waltersboro to resume her employment. She would go back each week to see her baby; and it was on one of such occasions in July, 1943, that she was criminally attacked by her bestial father, Fairey Padgett.

Petitioner testified that the attack occurred in her bedroom between nine and ten o'clock in the morning. Her mother had gone into town to shop for the three brothers, and while they were away, her father came into the house under the influence of liquor (the evidence was that he drank continuously), and forcibly assaulted petitioner under revolting circumstances that appear in some detail in the transcript of the evidence at the hearing. She testified that she "was afraid" and "didn't know what to do, because there wasn't anyone around", but when her mother returned home a few hours later, she reported the occurrence to her mother, who "was afraid of him herself".

Petitioner returned to Waltersboro the same day, and did not again see her father until later in the month, when he accosted her on the street in Waltersboro and threatened her life, but was prevented from committing any possible act of violence by the fortuitous arrival of a police officer. Petitioner herself preferred no criminal charge against her father, but on the following August 5th her mother had him arrested and lodged in jail, and then brought suit for and obtained a decree of legal separation, which was the only relief available to her under the laws of South Carolina. Petitioner testified that she saw her father on that occasion from a window of the house in which she was living in Waltersboro, but since that day had never seen him or had any communication of any sort from him.

The account of the attack, as related by petitioner, was corroborated by her mother except for an inconsequential discrepancy as to the time in the morning when the mother had left for town. Although insisting that she had no definite recollection of the precise hour when she had gone away, the mother, when pressed by counsel, finally estimated it as around eleven or eleven-thirty o'clock. If this was true, it would have meant that the attack could not have occurred until some two hours later than petitioner had recalled, although, in fairness to petitioner, it should be stated that when she was being interrogated about the matter on cross-examination, she first told

respondent's counsel, "I couldn't give you the exact time, but it was in the morning". Save for the variation noted, to which respondent seems to attach considerable significance, the mother's testimony confirmed that of petitioner in so far as she was in a position to have known the facts. It revealed that when she returned home, she found petitioner "pretty hysterical"; that petitioner informed her of the assault; that she confronted her husband with the matter, and then separated from him; that she had him arrested and lodged in jail; that she sued for and obtained a decree of legal separation; and that she had never seen or heard from her husband since the entry of the decree.

Petitioner insisted in her testimony that she had had only the one such relation with her father, and it by reason of his assault upon her; and her mother likewise testified that the one incident was all of which she had ever known. Respondent's evidence, based upon petitioner's alleged admissions against interest, raised an issue of fact upon this precise feature of the case. According to respondent's evidence, the admissions were made to Mrs. Freda Hunt, a deputy probation officer of the Juvenile Court of the City of St. Louis, in the course of a conference in Mrs. Hunt's office in regard to the temporary custody of the child. Respondent's personal recollection was that when petitioner was asked by Mrs. Hunt as to the number of such relations, "she just said she had more than one", while Mrs. Hunt testified that "she said it happened several times". It is most significant, however, that in testifying to petitioner's alleged statement that "it happened several times", Mrs. Hunt added the fact that petitioner had also said that "she wasn't able to avoid it".

The importance of this is that respondent's own evidence, while undoubtedly serving to raise an issue of fact upon the truth of petitioner's testimony that she had been subjected to only the one relation with her father, at the same time effectively disclosed that even if "it happened several times", the relationship between the father and petitioner was at least not incestuous, but was brought about against petitioner's will, and because of her inability to resist her brutal father's domination. While disclaiming but the one actual assault upon her, petitioner herself testified that when she was still a young girl, her father would take her out and "feel over my body and all", so that under any view of the evidence there could be no question about the father's utter depravity and complete lack of decent human instincts. So long, however, as petitioner was but an unwilling victim of his bestiality, no blame may attach to her for any indignity that was heaped upon her; and the Commissioner finds that the charge of incest was not sustained by the evidence in the case.

After the episode in July, 1943, which led up to the separation of petitioner's parents and the award to the mother of a decree of legal separation, petitioner continued on at her employment in Walters-

boro, staying at the home of a Mrs. Fox, while her baby was left in the care of her mother. Neither respondent in St. Louis nor Emil in Italy knew anything at all of what had occurred; but Emil, being concerned about the welfare of his wife and baby, had written respondent that he was worried about them and would feel better satisfied if they were in St. Louis with her. Acting on his suggestion, respondent went to Waltersboro unannounced, and brought petitioner and the baby back to St. Louis with her, where they arrived about September 1, 1943.

For a while all went well between petitioner and her husband's people. Petitioner shared a room with the younger daughter (she was then only eighteen years of age herself); she and respondent jointly cared for the baby; and the financial support for herself and the baby was provided by the allotment which she received each month from the United States Goverment. The baby had admittedly not been very well in the immediate period after birth, but on being brought to St. Louis, its formula was changed at the suggestion of a local pediatrician, and in a short time it began to thrive and improve in health in its new environment. This does not mean, however, that it had been denied medical attention in Waltersboro, but instead respondent's complaint was that "they had given her the formula too strong, so I took her to a baby specialist and he changed her food".

One of the first things to disturb the even tenor in the De Castro household was petitioner's receipt of a letter from a man named Allen, postmarked in Raleigh, North Carolina, on October 6, 1943. In some unexplained manner the letter came to respondent's attention, and she had it in her possession at the hearing before the Commissioner. The salutation of the letter was "Dear Little Bit", which petitioner explained was the nickname by which she was known to the employees around the bus station, and which had very likely been given her because of the fact that she is diminutive in size and quite youthful in appearance. The letter began by reciting that Allen had received both of petitioner's letters, which she admitted having written to him; and its further contents contained language which, on its face, was undoubtedly such as to excite suspicion about the previous relationship between petitioner and Allen, and which, if petitioner had not been at fault, was certainly most foolish and indiscreet on Allen's part. Not all of the letter was of such a character, however, and much of it did no more than indicate that petitioner had been popular with her fellow employees, who were anxious to have her back as one of their number again. Petitioner explained that Allen was "quite an old fellow" who worked as a bus driver out of Waltersboro, and that not only did he have her St. Louis address, but in fact "they all had it where I was working at with the Interstate Greyhound Company". Allen's name only appeared the one time in connection with the letter, and it may be that the letter was merely the product of

ignorance and bad taste on his part, and was intended to be taken in a humorous vein. However this may be, it was competent in evidence upon the issue of petitioner's fitness; and her counsel's objection to its admission in evidence is consequently overruled.

A far more serious situation developed when circumstances made it questionable whether petitioner might be pregnant. Of course she alone knew of her father's assault upon her; and when she began to experience certain physical irregularities, she became fearful that she might be in that condition, and for advice as to what to do, wrote to a maternal aunt, Jean Greer, who was living in Tampa, Florida, at the time, where her husband was stationed as a member of the armed forces. In the nature of things, she could not confide in respondent, although respondent testified that after petitioner had been with the family for about a month, the suspicions of herself and her husband were aroused when they noticed that petitioner was "getting stout".

Petitioner was unquestionably considering the possibility of an abortion in the desperate situation which she feared she was in; and under date of October 28, 1943, her aunt wrote her from Florida, informing her that she had consulted a doctor, who had advised against taking any "kind of medicine" upon the ground that to do so would be very dangerous. An "operation" by a doctor was the only remedy that the aunt could recommend; and since it would be necessary that petitioner should conceal any such thing from her "people" in St. Louis, the aunt offered suggestions as to what excuse petitioner might give for going away, and as to how arrangements might be made for sending her mail so as to lead respondent and her family to believe that she was merely visiting with the aunt in Florida. The baby was to be left in the care of respondent for the month that petitioner might be expected to be away.

Unknown to petitioner, respondent read the letter, and was naturally shocked at its disclosures. She found the letter in petitioner's dresser drawer, and excused her action in taking it out and reading it upon the ground that being already suspicious of petitioner's condition, her suspicions were further aroused when, in the case of this particular letter, petitioner departed from her usual custom of showing the De Castros "all the mail from her folks". Taking it to be a fact that petitioner was pregnant, and having no reason to know that if she was, it was the result of her father's assault upon her, respondent obtained legal advice as to what steps she should take, and was advised to have a photostatic copy of the letter made for use in an action for divorce which she was recommending that Emil bring. Petitioner objected to the admission of the photostatic copy of the letter in this proceeding, but that objection is likewise overruled.

With their suspicions apparently confirmed by what the letter had disclosed, respondent and her husband confronted petitioner with the

matter, and not only demanded that she give Emil a divorce, but also informed her that under the circumstances it would be necessary that she leave their home. Respondent had meanwhile consulted the "Army Relief", where she was advised that the whole situation should be referred to the Juvenile Court.

On November 8, 1943, respondent took petitioner to the Juvenile Court for the purpose of having some disposition made with respect to the custody of Gloria Jean. It should be noted that no proceeding was instituted before the court itself, but instead the whole matter was sought to be adjusted in the conference with Freda Hunt, the deputy probation officer. It was on this occasion, in response to Mrs. Hunt's questioning, that petitioner revealed her father's responsibility for what she assumed to be her condition, and told Mrs. Hunt that "she wasn't able to avoid it". It was at the conclusion of this conference that Mrs. Hunt prepared the letter, which petitioner signed in the lower left-hand corner, by which Mrs. Hunt purported to award the temporary custody of Gloria Jean to respondent in view of petitioner's expressed intention to make her home with her aunt in Florida until Emil's return from the armed forces.

It is enough to say that respondent's counsel themselves concede that Mrs. Hunt's letter was of no binding force or consequence. Under Section 9616, Revised Statutes Missouri 1939, Missouri Revised Statutes Annotated, section 9616, the Juvenile Court, upon petition filed, may order the transfer of a child's custody from one person to another, but there is no such power conferred upon a probation officer. Nor is petitioner in anywise concluded by reason of her own concurrence in Mrs. Hunt's undertaking. As natural parent, she could not irrevocably divest herself of the right of custody over her minor child by any agreement to surrender it to another, and she may now recall the child, regardless of the agreement, unless the child's own welfare forbids. [Weir v. Marley, 99 Mo. 484, 12 S. W. 798; In the Matter of Berenice S. Scarritt, 76 Mo. 565.]

While possessing no conclusive effect, the letter is none the less material to the extent that it sheds light upon circumstances which are vital in the case, and in this respect there is one significant feature which happily differentiates this case from many of its kind. This is the fact that Gloria Jean was not turned over to respondent under any direct promise, or under circumstances that would have entitled respondent to assume, that she would be permitted to keep the child permanently. On the contrary, the evidence is all agreed that respondent took the child with full appreciation of the fact that she was only being given temporary custody. The only dispute between the parties was with respect to their understanding as to when respondent's temporary custody should end. Petitioner testified that "she promised me when I got settled and a place to take care of the baby and knew I could take care of her, that I could come and get

her''. Respondent's theory, on the other hand, was that she was to have custody of the child until Emil returned from service. Very likely both of such contingencies were considered by the parties at the time, but the important thing is that the arrangement was in any event only temporary from its inception, so that petitioner is not put in the light of acting in bad faith by now demanding the recovery of her child.

After concluding the conference in Mrs. Hunt's office, petitioner left St. Louis by bus that same evening, and went direct to Tampa, Florida, where she was shortly examined by a doctor with respect to the conditions that had caused her to fear that she was pregnant. The Florida doctor assured her that she was not pregnant, and told her that she had ''a growth condition that was due to the premature birth of the baby''. About a year later she was examined by a doctor in Chicago, who testified that he was given a history of the presence of an abdominal tumor, but that what he found was a retroverted uterus, which might or might not have existed before the birth of Gloria Jean. He testified that in some cases a retroverted uterus will bring about such physical irregularities as those which had caused petitioner to fear that she was pregnant, but of course he had no personal knowledge as to whether that had been true in petitioner's case. It thus appears that upon the issue of whether petitioner was actually pregnant, there was positive evidence that she was not, and none whatever to the contrary. Furthermore, just as the Commissioner indicated to counsel at the hearing, even if she had been pregnant, ·it would not have militated against her standing in this proceeding, so long as such pregnancy had resulted from an attack upon her which had been accomplished against her will.

Despite the most unusual circumstances under which petitioner had been compelled to leave St. Louis on November 8, 1943, her own attitude at least towards the De Castro family would appear to have been entirely amicable. On November 15th she wrote to them as ''Dear Folks'', advising that she had arrived safely at her destination, and inquiring about her ''darling baby''. She went on to say: ''I am planning on going to work next week so I.can get Gloria Jean something nice for Christmas. They have lovely collections of things at the stores up here.'' On December 4th she wrote her sister-in-law, Rose Marie, from Tampa, again expressing great affection for Gloria Jean, accompanied with a fear that the baby might forget her.

Petitioner continued to make her home with her maternal aunt, Jean Greer, in Florida, until January, 1944, when she went to Charleston, South Carolina, to live with her mother, who had apparently established a residence in Charleston after the entry of the decree of legal separation from her husband, Fairey Padgett. On January 24, 1944, petitioner wrote her sister-in-law, Rose Marie, from Charleston, explaining that her failure to have written for some time was

due to the fact that she had been ill with double pneumonia. Again she expressed affection for Gloria Jean, and advised that she had mailed the baby a Christmas package, but that because of a mistake in the address, it had been returned to her. She then went on to say that she had come to Charleston to be with her mother; that she and her mother were both employed; and that they had an apartment which they were sharing with her two younger brothers. She then called attention to the fact that she had had no letter from the De Castro family since she had last written them, and asked that Rose Marie write her and tell her "all about Gloria Jean".

The Commissioner overrules petitioner's objection to the introduction of the three letters in evidence as a part of respondent's case.

In May, 1944, petitioner left Charleston, and returned to Tampa, to reside with Jean Greer once again; and while in Tampa in a hospital she was visited by respondent, who came to see about the division of Emil's personal effects, which had been sent over from Italy by the War Department. Emil had meanwhile been killed in action in the preceding January. Petitioner testified that on this occasion she inquired of respondent when she might regain the custody of Gloria Jean, and that "she told me that whenever I got settled and a place to take care of her that I could come and get the baby".

In the early part of September, 1944, petitioner and her mother were invited to come to Chicago to make their home with petitioner's maternal grandparents, Mr. and Mrs. Joe Weyman. This was unquestionably a decided turn for the better in petitioner's affairs. At the time of her arrival to live with her grandparents, the latter were residing in an apartment hotel at 1432 East Sixty-seventh Street, but in April of this year Weyman purchased a thirteen-room house at 7424 Dante Avenue, where the family has since resided. The house stands across an alley from a public school to the rear, and is located within two blocks of a Catholic parochial school. The Weymans themselves are Catholics, just as are respondent and her family. Petitioner and her mother are Adventists.

The permanent members of the Weyman household are the two grandparents, petitioner, her mother, and an aunt of petitioner, whose husband is now in service. Certain other former members either are moving, or have already moved away. Weyman, the superintendent of a printing plant, is sixty, and his wife fifty-seven years of age. The Commissioner was much impressed with Weyman, who gives the appearance of being a very responsible sort of person.

Weyman testified that when he brought petitioner up from Florida, he told her that he wanted her to get her baby, and assured her that she could have a home with him and her grandmother as long as she should desire. The grandmother likewise testified that she is willing to have petitioner and the baby stay there "forever, if she wishes", and that she will be glad to take care of the child while pe-

titioner is away from home at work. She stated that she had been in good health all her life, and respondent's counsel noted, "You look like that, too."

The evidence shows that petitioner is now employed in Chicago, earning twenty dollars a week, with the promise of an early increase. According to both the grandfather and the grandmother, petitioner's conduct with them is exemplary, and there was no evidence whatever to the contrary. Petitioner's father is not a member of the household (in fact the grandfather has never seen him, and spoke very contemptuously of him), and neither petitioner nor her mother has had any communication from him. The only information they have had regarding him was contained in a letter which petitioner's mother had received from her daughter-in-law in South Carolina, in which the daughter-in-law had intimated that he was still in Waltersboro, and was reputed to be about to leave some woman with whom he had been living.

The good character of the Weyman home was further substantiated by a report from the juvenile authorities in Chicago. In December, 1944, the Chicago authorities, at the request of Mrs. Hunt of this city, made an investigation to determine, so Mrs. Hunt said, whether petitioner was then so situated as to be able to give her baby proper care. When asked whether the sum and substance of the report had not revealed that petitioner was a fit person to have the custody of her child, Mrs. Hunt answered: "To a certain extent it was."

Very shortly after becoming a member of her grandparents' household in Chicago, petitioner began to press respondent for the return of Gloria Jean.

On November 19, 1944, petitioner wrote respondent, advising that she was at last permanently settled with her grandparents, who would assist her in taking care of the baby; that she had a steady job as clerk in a grocery store; and that she desired to come to St. Louis and get the baby, who would be well taken care of and given a religious education. In December, 1944, petitioner again wrote respondent, calling attention to the fact that she had had no reply to her previous letter, and again asking that respondent let her know when she could come for the baby.

In a letter postmarked December 28, 1944, respondent replied to petitioner inquiring about the capacity of the grandmother to care for the baby, and advising that petitioner would have to give her more time to think the matter over, inasmuch as the other members of her family did not think that petitioner was sincere.

On January 16, 1945, petitioner replied to respondent at considerable length, giving her a picture of conditions as they existed in her grandparents' home; assuring her that she intended to make her future home with them; and insisting upon her sincerity in desiring to have the baby with her. On March 28, 1945, she again wrote re-

spondent, reminding her that she had had no reply from respondent to her previous letter, and stating that she could not understand respondent's attitude in light of the promises that respondent had made her.

Respondent finally answered on April 2, 1945, advising petitioner that she was not yet in a position to decide her course, inasmuch as she was not the only person whose wishes were to be considered. On May 7, 1945, petitioner again wrote respondent, once more assuring respondent of her fitness to have the care of her child. The record discloses no further correspondence between the two, and it was apparently at this juncture of the case that petitioner consulted legal advice with regard to the institution of this proceeding.

A very serious matter at the inception of the hearing was the charge in the return that following the alleged incestuous relationship between petitioner and her father in Waltersboro, "petitioner has continued and is now living with said father in the City of Chicago, Illinois".

The Commissioner has already found that petitioner's relationship with her father was not incestuous, but granting her innocence in this regard, she could nevertheless hardly claim to be a fit person to have the custody of her child if it appeared that she was so callous to her father's depravity as to have continued to live with him after his assault upon her.

Respondent's evidence in support of this charge in her return was based upon such flimsy circumstances as that in her letter of November 15, 1943, dispatched after her arrival in Tampa from St. Louis, petitioner had written that the stores had lovely collections of things "up here". Notwithstanding the fact that the envelope was postmarked from Tampa, respondent would infer that by saying "up here" instead of "down here", petitioner must have been in South Carolina where her father was, or at least must have gone to Tampa by way of South Carolina. Other evidence was that on two or three occasions petitioner had allegedly told respondent that she was going to live with her "parents"; and the final claim was made that in one of her first letters from Chicago, petitioner had stated that her "parents" were O.K. No such letter was produced by respondent; and it seems inconceivable that if petitioner had actually written a letter indicating that she was still living with her father or having contacts with him, respondent would not have carefully preserved it. It will be recalled that respondent had previously gone to the trouble and expense of procuring a photostatic copy of the letter to petitioner from Jean Greer, so that she was unquestionably well aware of the necessity of saving any letter or other instrument which might be valuable as evidence in a legal proceeding. The overwhelming weight of the evidence was to the effect that petitioner had not

lived or had contacts with her father since his attack upon her in July, 1943, and the Commissioner so finds the fact to be.

There are two principles of law by which the facts are to be measured in determining the Commissioner's recommendation in the case.

The first of these propositions is that under our law a parent has a natural right to the custody of his minor child, a right which public policy demands shall be held inviolate, and which, in a contest between the parent and some third person, is not to be denied the parent unless it is made manifest to the court that the parent, for some strong and cogent reason, is unfit or incompetent to have his child, so that the welfare of the child itself demands a different disposition. [In the Matter of Berenice S. Scarritt, *supra*; State ex rel. v. Ellison, 271 Mo. 416, 196 S. W. 1140; Bell v. Catholic Charities (Mo. App.), 170 S. W. (2d) 697; McDevitt v. Morrison (Mo. App.), 180 S. W. (2d) 608; In re Ingenbohs, 173 Mo. App. 261, 158 S. W. 878; Ex parte Archer (Mo. App.), 253 S. W. 1095.]

The second and equally important proposition is that the natural parent's right to the custody of his child must be determined with respect to present, existing conditions, with evidence of past conditions being material only to the extent that they clarify and cast light on the existing conditions. [39 C. J. S., Habeas Corpus, sec. 41c, p. 577; Ex parte Schultz, 237 Mo. App. 1107, 180 S. W. (2d) 613.]

The application of these two principles of law leaves no doubt in the Commissioner's mind as to what his recommendation should be.

In view of respondent's utter failure to sustain her affirmative charge that petitioner had been guilty of an incestuous relationship with her own father prior to July, 1943, and had since continued to live with him and was now living with him in the City of Chicago, the question of whether petitioner shall be accorded her natural right to the custody of her child depends upon whether there are special and extraordinary circumstances which indicate that its welfare would be jeopardized if it should now be given over to her.

The evidence reveals no such state of affairs. Had this proceeding been brought before petitioner was so fortunate as to be able to establish a permanent home with her grandparents in Chicago, there might have been room for serious doubt as to whether she was then in a position to give her child proper care. But any such doubt is now completely removed. The grandparents are obviously substantial people; the child's environment in its new home will be in all respects satisfactory; and there is no reason to be apprehensive that it will be neglected with regard to either its temporal or spiritual welfare. Nor is there any ground to fear that it will be subjected to the evil influence of its own grandfather, Fairey Padgett. It will be as secure in that respect with petitioner's grandparents in Chicago as it now is with respondent in St. Louis. There is a presumption of law that it is to the best interests of a child to be in the custody of

its natural parent (State ex rel. v. Ellison, *supra*), and this presumption becomes conclusive when the facts themselves disclose that the natural parent is a fit and competent person to have the custody of her child. The Commissioner finds from the evidence that petitioner is a fit and competent person, with the reasonable likelihood that she will continue to be so in the foreseeable future, and that the enforcement of her right as natural parent will not react to the disadvantage of the child.

In reaching this conclusion the Commissioner does not mean to imply that the child has been neglected while in the custody of respondent. On the contrary, the evidence shows that respondent has given it the best of care, and has a very deep and sincere affection for it. Unquestionably she rendered a very valuable service to both the child and the petitioner at a time when the latter, by reason of an unfortunate state of circumstances in which she had been unwillingly placed, was in no condition to assume the sole responsibility of caring for the child herself. However that situation no longer exists; and respondent's difficulty lies in her persistent refusal to accept the facts, and to realize that now that petitioner has become permanently settled in a suitable home where the child can recive adequate care and attention, there is no longer any basis for denying her the custody to which her status as natural parent entitles her.

The Commissioner accordingly recommends that the custody of the child in controversy, Gloria Jean De Castro, be awarded to petitioner.

PER CURIAM:—After reading all the testimony taken at the hearing before the Commissioner, after examining all the exhibits filed therewith, and after carefully considering the Commissioner's report, we are convinced that the Commissioner reached the correct and proper conclusion in the case, and we therefore adopt his report as the opinion of the court.

It is accordingly ordered that the custody of the child, Gloria Jean De Castro, be at once awarded to the petitioner, Madelyn De Castro.

*Hughes, P. J.,* and *McCullen* and *Anderson, JJ.,* concur.