In re Petitioner, STEPHEN _____,
a Child under 17 years of Age, Pro Ami.

No. 25182.

Kansas City Court of Appeals.

Missouri.

Oct. 6, 1969.

Francis L. Roach, Solbert M. Wasserstrom, Kansas City, for appellant, Stephen, pro ami.

JAMES W. BROADDUS, Special Commissioner.

This appeal is from a proceeding in the Juvenile Court of Jackson County in which Stephen _____ was declared a neglected child, and his custody was taken from his maternal grandparents.

Stephen, age 6 at the date of the hearing, was born out of wedlock to Julie _____. At that time Julie was a sophomore at Nebraska University. Immediately after Stephen's birth, Julie returned to college leaving the baby with her parents. These grandparents have been substantial people. They have been married 36 years and have reared a family of five children, to all of whom they have afforded a college education. The grandfather is a graduate of Kansas City Junior College and had a steady, aggressive work record until the events hereinafter de-

scribed. At the time of Stephen's birth the grandfather was manager of Blue Hills Country Club, and he and his wife owned their home in Mission, Kansas, which they still own. In addition they own property at 3331 Forest in Kansas City, Missouri.

In 1963 these grandparents acquired a Motel in Jefferson City, in which they invested $40–50,000. That operation went reasonably well until about a year and a half before the date of the hearing, when a new Holiday Inn was erected a short distance away from their property. The Motel was unable to meet this competition, and the operation went steadily downhill economically.

Faced with this desperate situation the grandparents wanted to abandon the Motel and leave Jefferson City. The grandfather however refused and instead succumbed to drink. The grandmother felt that this was an undesirable environment for Stephen, and she therefore left Jefferson City with the boy, separating from her husband for a period of six months to a year. During that period of time she also faced a drinking problem. During this period Stephen attended kindergarten in three different schools but missed only three days of schooling.

Finally, the inevitable occurred and the Motel was foreclosed. The grandfather had a complete breakdown, and his son Matt had to lend physical assistance to get him to Kansas City. When he arrived in Kansas City he was confined to bed under the care of his wife. At this time Matt suggested to his parents that he would take Stephen temporarily, to which they agreed. The very next day, Matt turned Stephen over to the Juvenile authorities, who in turn arranged for Stephen to be placed in the custody of Matt's mother-in-law, Mrs. W_____. When the grandfather began to feel better, he and his wife went to Matt's home to get Stephen, at which time an argument took place. Matt told them that the child was at W_____'s.

The grandparents then proceeded there where another argument occurred.

A hearing was had on September 23, 1968, at which time the court received evidence and, also considered various documentary reports in the staff file which were not placed in evidence. At the close of the hearing, the court stated orally that "the failure of the maternal grandparents to care for the child * * * has been sustained by the evidence." Judgment was entered finding that "the parents of said Stephen _____ neglect to provide him with the proper support and other care necessary for his well-being" and he was placed in the care and custody of Mr. and Mrs. W_____.

Mrs. W_____, to whom custody was awarded is 53 years of age and has nine children, of whom the youngest is 12 years old. Her previous contact with Stephen was very casual. Mrs. W_____ expects to be able to adopt Stephen, with which attitude the court agreed, even though he recognized that actual adoption could not be ordered at this time.

Julie is now married and lives with her husband in California. Stephen is more "like a little brother to her" than a son, and she has no desire to take him into her home. The maternal grandparents are "devoted" to Stephen, to whom "he is as close" as any of their five children. The wife of Matt, who precipitated the present proceeding, admitted that these maternal grandparents are the only ones who really want custody of Stephen.

Matt, his wife and his mother-in-law testified in a very generalized way that Stephen had been left to irregular eating habits; that on some occasions he did not have proper clothing, and that he had not received regular medical attention. This testimony was summed up by Matt's statement that "just the whole picture didn't seem right to us." On the other hand the grandparents testified that Stephen had received full medical attention and even Matt

admitted that "we felt that he was in good physical condition, he wasn't lacking in need of attention."

At the time of the hearing the grandfather had stopped drinking and had "not had a drink in six months." He was employed as night auditor at the Plaza Inn Motel in Kansas City and had his "first night off in a month's time the other night."

The title of Sec. 211.031 of the Juvenile Code, V.A.M.S. reads: "Jurisdiction of juvenile court over children who are *neglected* or charged with crime."

And the section gives the Juvenile Court jurisdiction where: "1(a)" "The parents or other persons legally responsible for the care and support of the child *neglect* or *refuse* to provide proper support, education which is required by law, medical, surgical or other care necessary for his well-being."

The rules governing the instant case were summarized by this court in the case of State v. Greer, 311 S.W.2d 49, 51, as follows:

"In Edwards v. Engledorf, Mo.App., 192 S.W.2d 31, the Springfield Court of Appeals held there is a presumption that the best interest of the child is to be in the custody of a parent. On page 33 of the opinion the court said: 'The parents have a right to the custody of their children by nature and by law, which rights should never be denied except for the most cogent reasons, * * *'. In Williams v. Williams, 240 Mo.App. 336, 205 S.W.2d 949, 1. c. 953, our own court made this statement: 'This concept of the relation of child and parent had led to the well established rule of law that as against the world a parent has the primary right to the custody of his child, and that he is presumed to be fit and qualified for that natural privilege. Whosoever denies him this claim has the burden of proving his unfitness'. In 67 C.J.S. Parent and Child, § 12, p. 651, the rule is phrased this way: 'In order to justify depriving a parent of the custody of a child in favor of third persons there must be substantial reasons or, as various courts have put it, the reasons must be real, cogent, weighty, strong, powerful, serious, or grave'. Continuing and on page 655: 'It has been held that there must be compelling or very special reasons for denying a mother the custody of a child of tender age, and that this will be done only under very exceptional or most unusual circumstances'."

Similarly, in Minor Children of F_____ B_____ v. Caruthers, 323 S.W.2d 397, 1. c. 401, the St. Louis Court of Appeals said:

■ "Any restriction of the parental right must be cautiously imposed and such restriction should never be greater than that which is necessary to promote the welfare of the child."

The situation in this case is that of maternal grandparents who have had the care and custody of their grandson from the day he was born. No witness even remotely questioned that there was deep love and affection between the grandparents and this child. Even Matt, the one who instigated this proceeding so admitted. His wife went so far as to admit that these grandparents are "the only one(s) that actually wants him." She also said that none of the grandparents children "are willing to take care of him." And the husband of the child's mother "expressed the opinion, that he didn't want children living with him."

Concerning the alleged lack of care that the child received when it was with its grandparents the evidence was as follows: Matt's wife said: "Stephen has gone without supervision—I mean at the restaurant—and he could order any kind of food he wanted." And that on one occasion, she was in the grandparents' home, the grandmother "was there and there was nobody upstairs taking care of him upstairs and Stephen would go upstairs, and if he wanted some food, he would take it up with him. I think all children need discipline." She

also said: "Stevie told my mother he had never seen a dentist." Here it can well be said that it is common knowledge that many children become six years of age without having seen a dentist, and still are not considered *neglected*. According to the grandfather, the child has had the "full medical course that you give to a youngster."

The fact of the matter is that the testimony by the complaining witnesses was not directed to the question of neglect of the child, but rather the entire thrust of their testimony was an effort to show that the grandparents were in poor economic straits and had been using alcohol to excess.

The question at issue was not the nature of the situation as it existed in Jefferson City prior to the foreclosure of the Motel. Rather, the question was the situation and the best interest of the child after the grandfather had recovered from the traumatic experience of that foreclosure and had again resumed his lifetime pattern of hard and productive work.

The grandparents had gone through a calamitous experience. They had invested a lifetime of savings, amounting to $40–50,000 in the Motel only to see that investment go down the drain as a result of competition which they could not match. There is no question at all but that this situation drove the grandfather to drink and drove his wife to equally desperate measures.

However, at the date of the hearing in the court below that situation had completely changed. The grandfather had recovered his health and was working steadily as a night auditor for the Plaza Inn. He had completely stopped drinking and had not had a drink for six months. Not one word appears in the transcript indicating any blemishes on either of these grandparents since the grandfather's physical recovery and his commencement of the job mentioned.

■ Many Missouri cases hold that the right of custody "must be determined with respect to present, existing conditions." Ex parte De Castro, 238 Mo.App. 1011, 190 S.W.2d 949, 959, and In re S_____, 306 S.W.2d 638, 641, Mo.App. (citing cases). As said in C_____ v. B_____, 358 S.W.2d 454, 460, Mo.App.: "His fitness as a parent was to be determined as of the dates of the hearings."

On cross-examination the grandfather was asked:

"Have you ever disciplined Stephen? A. Neither of us have ever had to spank him. Q. Don't you think that is unusual? A. I don't think that is unusual. Q. Then don't you think that he has ever needed one? A. No, he is a good obedient boy. We haven't had any trouble with him at all. That is why it has been such a shock to have someone snatch him away from us, which is what it amounts to. We had no forewarning of this—none, whatever, that is why it is such a shock. Q. In view of your age, do you feel that it is possible for you to furnish the proper care and support for this child? A. I still hold a pretty substantial job and my health is good, and because you are 63 years of age, doesn't really have anything to do with it. Q. But you are telling the Court that you can properly care for him and educate him? A. I know that we can and we will take proper care of him and educate Stephen, too."

The grandfather also said that it was "a terrible thing" that the boy "has been disturbed as much as he has been * * *. That boy is old enough to know that he is in a strange environment; that he is not at home." That the child is disturbed appears in the testimony of Mrs. W_____. She said "he seemed to be afraid that somebody would leave him * * *. Well, just yesterday, I was going up to Macy's and I asked him if he wanted to go, that they had a big tractor and a fire engine

for the children, and I asked him if he wanted to go—and he said if *I would make sure and remember him.*"

 It is appropriate to mention that the trial judge did have an administrative file containing various reports and documents which were not placed in evidence. However, it is completely improper to speculate what was in that file or to attempt to justify the action taken by the trial court based upon some speculation as to what may have appeared in those documents. This point is very clearly made by this court in its opinion in State v. Greer, 311 S.W.2d 49, 1. c. 52:

"Although such proceedings are properly conducted in a summary manner and even though it is possible the trial judge possessed extraneous information as to the merits of this controversy, still affirmative evidence of the required facts must appear of record. We cannot and will not on appeal magnify this evidence by surmise and conjecture and thereby deprive a natural mother of the custody of her child and prepare the way to place that child with strangers."

It may be that the grandparents are not the perfect persons whom professional sociologists might stipulate for the care of a child. That, however, is not the question. As was stated in the case of In re I_____, M_____, J_____, Mo. App., 428 S.W.2d 18, 1. c. 22:

"It is not the purpose of statutory neglect proceedings to find substitute or foster parents for children."

The wise policy of the law is to leave children with their parents (in this case grandparents who have always been in the position of parents) absent a strong showing of actual *neglect*. This policy is stated in Section 211.011, V.A. M.S., where it is provided that every child shall receive care "preferably in his own home". The "home" of this boy is with his maternal grandparents. This is the one and only home that he has ever known. This young boy is enttiled to the love of "the only one(s) that actually wants him", to use the words of one of the witnesses. It has been said many times that love and devotion directed to a child of tender age is worth more to him than all other things combined.

The judgment is not supported by clear, cogent and convincing evidence. Therefore, it should be reversed and the cause remanded with directions to set aside the judgment entered September 23, 1968, and return custody of Stephen _____ to his maternal grandparents. Your Special Commissioner so recommends.

PER CURIAM.

The foregoing opinion by JAMES W. BROADDUS, Special Commissioner, is hereby adopted as the opinion of the Court and the judgment is reversed and the cause remanded with directions to set aside the judgment entered September 23, 1968, and return custody of Stephen _____ to his maternal grandparents.

All concur.