**In the Interest of C. L. M., a minor child.**

**Appeal of Regina DUTKIEWICZ.**

**No. 63111.**

Supreme Court of Missouri, En Banc.

Dec. 8, 1981.

David V. Uthoff, St. Louis, for appellant.

Terry W. Wiese, St. Louis City Juvenile Court, St. Louis, for respondent.

HIGGINS, Judge.

Regina Dutkiewicz appeals, Rule 120.01, from a judgment which encompasses an adjudicatory determination under § 211.031, RSMo 1978, that she is incapable of provid-

ing the necessary, proper care for her 18 month old daughter, C.L.M.[1], and a resultant dispositional order under § 211.181, RSMo 1978, that transferred the custody of the child to the Division of Family Services for appropriate foster care placement, the child to remain under the jurisdiction of the Court. *See* §§ 211.041, and 211.251, RSMo 1978.

The Court of Appeals, Eastern District affirmed. The case was transferred by this Court to consider again appellant's contentions that the judgment is "both against the weight of the evidence and not supported by substantial evidence" and "erroneous in application of Missouri case law." Affirmed.

This case is for review under Rule 73.01(c); and the judgment is to be sustained:

> unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong. . . .

*Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *See* § 211.171.6, RSMo 1978; *R. L. W. v. Billings*, 451 S.W.2d 125, 127 (Mo. banc 1970).

The Juvenile Court conducted a bifurcated hearing on a petition in the interest of C. L. M. filed pursuant to § 211.031, RSMo 1978, which, as amended, alleged that C.L.M. was within the jurisdiction of the court and without proper care and support in that: Regina Dutkiewicz, her mother, was currently suffering from residual schizophrenia, and had previously suffered from acute dissociative episodes, acute catatonic episodes, and epilepsy for which she had been hospitalized at Wohl Memorial Mental Health Institute for approximately one month in 1977; that she was incapable of providing the care required by C.L.M., an infant under two years old; and that as a result, it would be in the best interest of C.L.M. that her legal and physical custody be given on a temporary basis to the Division of Family Services.

In the adjudicatory stage of the hearing, the court took judicial notice of juvenile court records made in 1977, which terminated the mother's parental rights to siblings of C.L.M.[2] These records contained findings of fact that the mother was hospitalized at the Wohl Institute from February 13, 1977, to March 5, 1977, and was there diagnosed as suffering from acute dissociative episodes, acute catatonic episodes and epilepsy.

Dr. McWay, a clinical psychologist, had twice recently examined the mother and subjected her to a battery of psychological tests.[3] Based upon the results of these tests and reports of other doctors who had previously examined and treated her in 1977, Dr. McWay gave his opinion that the mother, although of average intelligence, suffered from "residual schizophrenia". He explained this to mean that she fades in and out of the confused and disoriented mental state which exemplifies schizophrenia, and at such times is self-centered, impulsive and inattentive to her child's needs. Dr. McWay concluded that the mother's condition is serious, rendering her incapable of proper child care.

Dr. McWay conceded that his diagnosis differed from some of the other reports upon which he relied. He explained the difference was in the origin to which he ascribed the mother's mental defects and not in the symptoms displayed. He believed her malady to be "inorganic" or mental in nature whereas the differing reports had indicated the problem to be "organic"

---

1. C.L.M. was born out of wedlock; her father is unknown.

2. The records show that these terminations were based upon evidence that the children were suffering from malnutrition and failure to thrive.

3. These tests included the Wechsler Adult Intelligence Scale; the Bender-Gestalt; the Minnesota Multiphasic Personality Inventory and the Rorschach Ink Blot Test.

or physical in derivation. Dr. McWay indicated that an "organic" finding resulted in a prognosis less favorable than that which he found because an "organic" condition was irreversible. He believed that the mother might at some future date be able to provide adequate child care. Dr. McWay maintained that the origin of the problem did not alter his opinion that the mother was currently incapable of caring for children.

Dr. Kitchen, a psychiatrist, performed a "mental status evaluation" during the mother's recent hospitalization at Firmin Desloge Hospital, and a second evaluation in preparation for the hearing. She did not believe the mother suffered from psychosis or residual schizophrenia. She believed her educable and with help capable of caring for her child. Dr. Kitchen stated that she had "cognitive deficits", meaning her basis of judgment, and ability to do things are not that of most people of her age and education. The source of this problem was in her opinion "organic brain syndrome" or "brain damage, unquestionably related to her epilepsy." Dr. Kitchen felt this disorder was temporary in nature, but the condition posed some difficulty in her ability to perceive C.L.M.'s needs.

Dr. Kitchen did no testing herself. She relied on tests given by another doctor on the Firmin Desloge staff and the same 1977 reports used by Dr. McWay. Dr. Kitchen also recognized that medication may not totally control the mother's epilepsy.

The court found that the allegations of the petition had been sustained and that Ms. Dutkiewicz is incapable of managing and providing for the needs of her child, C.L.M.

## I.

Appellant contends the adjudicatory findings are not supported by substantial evidence and are against the weight of the evidence on the ground the opinions and diagnosis of a psychologist cannot support the court's findings when it was "refuted" by a psychiatrist.

The opinion of a psychiatrist does not of itself outweigh or refute the contrary opinion of a psychologist. The extent of an expert's experience or training in a particular field goes to the weight of his testimony and does not render his testimony incompetent. *Swope v. Printz*, 468 S.W.2d 34, 40 (Mo.1971); *Pate v. St. Louis Independent Packing Co.*, 428 S.W.2d 744, 750 (Mo.App.1968). While the court may rule that a certain subject of inquiry requires that a member of a certain profession be called, it is not normally required that a specialist in a particular branch of the profession testify. *See*, E. Cleary, et al., McCormick on Evidence, § 13 at 30 (1972). In this case, there is no reason that the opinion of the psychologist could not be accepted over that of the psychiatrist. The dispositive issue is mental capacity and, in particular, capacity to care for an infant. The basis of much of the expert evidence was psychological testing; Dr. Kitchen did no testing herself. Ultimately, it is for the trier of fact to weigh the conflicting testimony of experts in light of their experience, knowledge, the attention each has given to the case at hand and the reasoning underlying each opinion. *Richard B. Curnow, M.D., Inc. v. Sloan*, 625 S.W.2d 605 (Mo. banc 1981).

The testimony of Dr. McWay provides a substantial evidentiary basis for the trial court's finding that the mother was currently suffering from residual schizophrenia; that she was presently incapable of rendering the parental care required by an 18 month old infant; and that C.L.M. was thus without proper care. Appellant's argument is also weakened by Dr. Kitchen's concession that the mother's ability as a parent is deficient.

Accordingly, it cannot be said that the adjudicatory findings are wrong on this contention. Rule 73.01(c); *Murphy v. Carron, supra*.[4]

---

4. In challenging the sufficiency of the evidence appellant cites: *In re Dimmitt*, 560 S.W.2d 368

(Mo.App.1977); *In re I. M. J.*, 428 S.W.2d 18 (Mo.App.1968); *In re M. P. S.*, 342 S.W.2d 277

## II.

Appellant contends the adjudicatory determination is contrary to the requirements of § 211.031.1(1)(a), RSMo 1978, because there was no showing of actual harm to the child, but only that such harm might occur. She contends that even if it is established that her mental problems render her incapable of providing proper care for her child, the court may not obtain jurisdiction absent a showing that the child's physical, mental or emotional needs were neglected while in her custody.

Appellant presents this point as an issue of law; she argues there was no showing that C.L.M.'s needs were actually neglected. If, as here, a parent's inability to provide child care is established, it requires little more to find that the considerable needs of an 18 month old infant are being left unattended. This is particularly true in light of C.L.M.'s own physical ailments.

The purpose of the juvenile law expressed in § 211.011, RSMo 1978, is to facilitate "the care, protection and discipline of children who come within the jurisdiction of the juvenile court." *Id.* The Juvenile Code permits the prevention of social, physical and psychological deterioration of children. *In re Dimmitt,* 560 S.W.2d 368, 372 (Mo. App.1977); *Sandra and Danny L. v. Jackson County Juvenile Court,* 544 S.W.2d 330, 333 (Mo.App.1976); *In re A. A.,* 533 S.W.2d 681, 684 (Mo.App.1976); *In re Ayres,* 513 S.W.2d 731, 735 (Mo.App.1974). In *Sandra and Danny L. v. Jackson County Juvenile Court, supra,* the court affirmed the trial court's removal of a child from his home based on the potential threat of emotional harm to the child as a result of domestic squabbling by his parents. The court explained:

> Nor must the juvenile court stand idly by in the face of a situation recognized as potentially harmful to the emotional well-being of a child and await the child's emotional destruction before attempting to protect the child from an injurious and harmful environment . . . .

(Mo.App.1961); and *State v. Taylor,* 323 S.W.2d 534 (Mo.App.1959). None are per-

*Id.* at 333. The court's adjudicatory determination as a preventative measure is not erroneous as a matter of law. The evidence shows it to be within the protective purview of § 211.031.1(1)(a) RSMo 1978.

## III.

Appellant questions the sufficiency of the evidence supporting the trial court's dispositional judgment which transferred custody of C.L.M. to the Division of Family Services for foster home placement. She argues that the evidence is not sufficient to overcome the policy favoring the natural parent's right of custody, citing *In re I. M. J.,* 428 S.W.2d 18 (Mo.App.1968), and *Ex parte DeCastro,* 238 Mo.App. 1011, 190 S.W.2d 949 (1945).

Additional evidence was taken during the dispositional stage which establishes: that C.L.M. has repeatedly suffered from grand mal seizures and has numerous heart ailments including congestive heart failure; that the mother also suffered recently from grand mal seizures and was mentally incapable of giving proper child care; that she failed to seek any medical attention for C.L.M. when the child fell down some stairs; and that her parental rights to three of C.L.M.'s siblings were terminated due to neglect in 1977, at which time the juvenile court file contained findings of malnutrition and failure to thrive. Based on all the evidence, the juvenile officer recommended that C.L.M. be removed from her mother's custody. Witness Obenhaus, a caseworker on behalf of the mother, disagreed with removal of the child, but admitted that the mother was incapable of providing appropriate care for C.L.M. without considerable assistance.

It should be noted that the mother's parental right has not been terminated and that she has rights of visitation which are being exercised. Termination under § 211.-447, RSMo 1978 is distinct from custody transfer under § 211.181, RSMo 1978; the latter is not irreversible and is subject to modification or termination. Rule 121.01;

suasive on the evidentiary issue raised in appellant's first point.

§ 211.251, RSMo 1978; *In re A. A., supra; State ex rel McCarty v. Kimberlin*, 508 S.W.2d 196, 199 (Mo.App.1974).[5]

■ In any proceeding involving child custody the overriding consideration is the welfare of the child. *In re A. A., supra; In re D. L. W.*, 530 S.W.2d 388 (Mo.App.1975); *Ex parte DeCastro, supra*; § 211.011, RSMo 1978.

> It is not the purpose of statutory neglect proceedings to find substitute or foster parents for children; the state has an interest in the integrity of the family, and in such proceedings parental rights should be limited only to the extent necessary to achieve the most desirable goal, whenever possible, of reinstating the natural and normal parent and child relationship.

*In re I. M. J., supra*, 428 S.W.2d at 22. The general rule that natural parents have a primary right to the custody of their children is controlling when it is consistent with the welfare of those children. This is so because the rule favoring natural parents stems from the presumption that maintaining the natural parent-child relationship is best for the child. When in conflict, however, the rule favoring parental custody is superceded by the concerns of the state for the child's welfare.

As demonstrated, there is substantial evidence to support the custody transfer of C. L.M. Neither the record nor the appellant's arguments engender a belief that it was wrong to award temporary custody of C.L.M. to the Division of Family Services for purposes of foster home care rather than to leave C.L.M. with her mother in her current circumstances. Rule 73.01(c); *Murphy v. Carron, supra.*

The judgment is affirmed.

All Concur.