**Cynthia DOWNING (Minich), Plaintiff-Appellant,**

v.

**Mark DOWNING, Defendant-Respondent.**

**No. KCD 27882.**

Missouri Court of Appeals, Kansas City District.

June 1, 1976.

Harry L. Porter, Marceline, for plaintiff-appellant.

Robert G. Smith, Brookfield, for defendant-respondent.

Before SHANGLER, P. J., and SWOFFORD and SOMERVILLE, JJ.

SHANGLER, Presiding Judge.

The mother, Cynthia Downing [now Minich], appeals from an order divesting her of the permanent custody of the child, Gretchen, then three years of age. The motion of the father, Mark Downing, to modify the divorce decree pleaded three changes of circumstances: 1) that the dwelling place occupied by the mother and child was not fit for habitation, 2) that the movant father was on occasion denied visitation and, 3) that both the mother and Michael Minich, her present husband, "have a general reputation as users of certain narcotic drugs".

The court after evidence entered the order:

Motion to Modify sustained and decree modified to award care and custody of child to defendant, to be maintained in home of defendant's parents, with right of reasonable visitation to plaintiff.

There was no substantial evidence to support the contentions that the child was not properly sheltered, or that the father was ever unreasonably denied visitation. We examine, therefore, whether the order of modification can be supported by proof that the mother and her new husband had an experience and reputation of drug use inimical to the welfare of the child.

The parties married when very young and their union was stormy and short. Cynthia was 17 years of age and still in high school; Mark was of comparable age. He drank excessively, they quarrelled, and in this temper, he frequently pommeled her. The child was born to them while Cynthia still attended the high school in Marceline. The paternal grandparents sat with the child, thus Cynthia was enabled to complete her high school diploma. After about a-year-and-a-half of marriage, the parties were divorced in December of 1972. The custody of the child, Gretchen, was awarded the mother with grant of reasonable visitation right to the father. As we have concluded, there is no serious evidence that Mark was ever unreasonably denied the exercise of that right. Nor, despite some general perjorative conclusions to the contrary, did the witnesses prove that the physical surroundings accorded the child were in any manner detrimental to her well-being.

After the divorce, Cynthia and the child continued to occupy an apartment unit leased from the Housing Authority of the City of Marceline. She remained in occupancy until May of 1973, some five months after the marriage was dissolved by divorce. During this period, complaints came to Jake Young, Executive Director of the Housing Authority, of noisy parties in the apartment occupied by Cynthia, and that the cars of the party-goers were parked in such number as to become a traffic jam. Mr. Young, called as a witness for the father, candidly acknowledged that the street was narrow and that only a few cars parked there would impede traffic. His own observations were that the company consisted of relatives and young friends on school vacations or home for the week-end. He noticed a particular red Ford parked nearby often, there in the evening and also in the morning when he came by again. He wrote her a letter of request that she control the loudness of the music from her apartment and that she show consideration for the parking needs of her neighbors. These conditions persisted, so in May of 1973 Cynthia was requested to vacate the premises by the Housing Authority. Mr. Young was emphatic that there were no complaints of immorality, but only of loud noise and traffic congestion.

The testimony of Mr. and Ms. Rauer, the next-door neighbors at the Housing Authority accommodations, reiterated the complaints of noise and car congestion. Their apartment was joined to the unit occupied by Cynthia by a common living room wall. Ms. Rauer also noticed numerous male visi-

tors come in the evening and leave in the morning. She noticed also that on the day Cynthia and Mark parted, Cynthia had been battered and was crying.

The first intimation of drug use came from Crystal Smith, a witness for Mark Downing. She had come to a number of parties at the apartment where Cynthia smoked marihuana, as did she. Then this colloquy followed:

Q. Did you ever have occasion to using any stronger or harder drugs?

A. Not using it, no.

Q. Did you see any in her possession or any at the party?

A. Yes.

Q. What did you see?

A. There was some mescaline I think is what it was.

Q. What were they doing with this mescaline?

A. She wasn't but they were putting it in capsules.

She testified further that on the occasions when she and Cynthia were alone, Cynthia never smoked marihuana, and she concluded that the guests at the parties were the source of supply. She was at the apartment on the day Cynthia and Mark separated; he had been drinking, they quarrelled, fought, and he struck and bruised Cynthia.

Another witness called by Mark Downing also had been at the parties. Jerry Jordan testified that there was drinking and smoking of marihuana, but no use of harder drugs. He never saw Cynthia smoke the substance. Also presented was Dennis Veatch, the Deputy Sheriff from Kirksville who served the civil process upon Cynthia for the modification proceeding. It was elicited from him that the reputation of Michael Minich for abiding with the law was not very good; that opinion, in turn, derived from an investigation he had made of drug use, but which discovered no wrongdoing by Minich.

The evidence of his parents was also presented by Mark Downing. They had cared for the child while Cynthia attended classes in completion of her high school

work. The elder Downing is a grocer in Marceline. He and his wife own and occupy a comfortable eight-room home. They enjoy good health and would eagerly accept the custody of the child, if ordered.

The evidence of appellant consisted in her own testimony and that of her present husband, Michael Minich. They both admitted to infrequent marihuana use when they were together and during social gatherings; she on less than ten occasions, and he about a dozen or so times. They both insisted that the experiment had been discontinued altogether after their marriage in February of 1974. She testified to episodes of drunken abuse from Mark during their marriage, including a discharge of firearm while in that condition. She admitted to frequent visitors at the Housing Authority apartment on week-ends when the child was on visitation with Mark and his parents. She admitted also to intimate relations with Michael, after the separation and divorce but before her marriage to him. These liaisons were on week-ends at her apartment when Gretchen was not there.

At the time of the hearing, Michael Minich was twenty-three years of age. [Our reckoning shows Cynthia then was twenty-one.] He was graduated from Northeast Missouri State University at Kirksville as the top ROTC student and was commissioned a second lieutenant in the Army. Cynthia and Michael removed residence to Kirksville when they married and in due time he was assigned to Fort Ord, California. His pay is some $830 per month and he is allowed quarters, post exchange use, insurance benefits for his family and all the other perquisites which governmental service offers. He has known Mark Downing since high school and attended a party, specified in the evidence, where Mark and everyone in the gathering were smoking marihuana. He loved the child Gretchen and was ready to devote himself properly to the welfare of the child should custody be retained in his wife Cynthia.

The judgment of the trial court equivocally orders the modification of custody in favor of the father, Mark, "to be main-

tained in the home of [Mark's] parents". It is not clear whether the order imports a finding of fitness of the natural father, Mark, for the custody of the infant girl, or whether it intends the grandparents as primary custodians. Mark testified that he proposed to remain in the home of his parents until he remarried. In that likely eventuality, and if—as one assumes—Mark and his new wife establish a separate household, the order is ambiguous as to whether the child shall remain with the grandparents.

If the order intends Mark as the primary custodian, it subsumes a finding of his fitness for that purpose, a finding clearly against the weight of the evidence. The evidence shows Mark to be cruelly abusive when drunk, and frequently in that condition. His conduct when inebriated is unpredictable, and it would be a needless experiment to commit the welfare of the infant girl to such uncertainty.

If, on the other hand, the order intends the custody in the grandparents, it imports that the natural mother, Cynthia, is unfit for the role, a finding clearly against the weight of the evidence and incongruous with the governing principles of law.

■ There is a presumption of sorts that a mother is better fit for the custody of a child of tender years. *Johnson v. Johnson,* 526 S.W.2d 33, 37[7] (Mo.App.1975). The rule is otherwise broadly stated that, all else equal, the custody of a child of tender years will be given to the mother. *L. D. H. v. T. P. H.,* 492 S.W.2d 857, 859[1–3] (Mo.App.1973). The evidence in such a proceeding does not often yield a balanced equation, however, so each case must rest on the equity of its own circumstances. And while the trial court may place a child with a third party, that course of action will be adopted only if both natural parents are unfit, incompetent, or unable to care for the child, or if the welfare of the child manifestly calls for a different disposition under the circumstances shown. *Stockton v. Guthary,* 415 S.W.2d 308, 312[7, 8] (Mo.App. 1967).

■ It is the rule that the morals and character of a parent are proper subjects of inquiry when the custody, and hence the welfare, of a child is under consideration. And since a step-parent also becomes a model for the behavior of the child, his morals and character are valid concerns of the court which entrusts custody to that household. *Feltman v. Feltman,* 514 S.W.2d 353, 354[7, 8] (Mo.App.1974). The most conclusive evidence that Cynthia and Michael used marihuana was their own testimony. It was a dalliance to which they both candidly admitted, but then put behind them after they married. There was no intimation that either of them experimented with any other drug or narcotic or kept or allowed such a substance on the dwelling premises. The testimony of Crystal Smith that on one social gathering at the Housing Authority apartment, a guest was putting into capsules "some mescaline I think is what it was", is too vague to prove the point. The testimony of other witnesses presented by Mark on the same issue all agree that marihuana was the only illicit substance used by Cynthia or any one else at those gatherings.

■ The movant pleaded and elicited testimony on the general reputation of Cynthia and Michael as users of "certain narcotic drugs". Reputation, of course, is the estimate the community has formed of the character of the person. 5 Wigmore on Evidence, § 1608 [Chadbourn rev. 1974]. The occasional use of marihuana during their pre-marriage was an admitted trait of the moral characters of both Cynthia and Michael, therefore any testimony of their reputations for such a practice was secondary to that conceded reality. Even so, much of such evidence offered by the movant lacked the quality implied by reputation: "the definite and final formation of opinion by the community". Wigmore, *op. cit.,* § 1611. The testimony of Deputy Sheriff Veatch that—after he had investigated Michael for drug abuse and found no culpability—his general reputation in Kirksville as a law-abiding citizen "wasn't very good", was obviously his personal estimate rather than the community judgment.

The question remains: whether a puerile curiosity about marihuana, since abandoned, must forever disqualify a parent, otherwise fit, from responsible custody of her child. While the violation of law cannot be justified,[1] the evidence shows that the use of marihuana was endemic among the youth of that community, including Cynthia, Mark and Michael. The evidence also shows that Cynthia and Michael have discontinued the use, and now enjoy a stable home and serious purpose. Their home is suitable for the child and custody by the mother is in her best interest and for her best welfare. Certainly, as against the claim of grandparents, the right of the natural mother fit for custody is paramount.

The judgment of the trial court is reversed and the cause remanded with directions that the custody of the child Gretchen be restored to the mother and that the award of $100 per month child support and the right of reasonable visitation to the father, Mark, be reinstated, all as ordered by the court on December 4, 1972.

All concur.

---

1. § 195.020, RSMo 1969, proscribes possession of certain controlled substances, including marihuana.