## In re the MARRIAGE OF R. R. and R. R.

### No. KCD 29869.

Missouri Court of Appeals, Kansas City District.

Nov. 27, 1978.

Kranitz & Kranitz, St. Joseph, for appellant.

Don Pierce, P. C., Robert D. Colley, St. Joseph, for respondent.

Before SOMERVILLE, P. J., and DIXON and TURNAGE, JJ.

TURNAGE, Judge.

The sole question presented on this appeal is the custody of two girls, ages 4 and 2, following the dissolution of the marriage of their parents, Ross and Rose. The trial court awarded custody to Rose and Ross appeals. Reversed and remanded.

At the time Ross and Rose were married, Rose had two daughters born out of wed-

lock. She and the two girls moved in with Ross and his mother. The house was large enough to accommodate Rose and her family and also the two girls later born of the marriage of Ross and Rose.

At the time of their marriage, Ross was in a remission stage of multiple sclerosis, but a few years later the disease became active and Ross was confined to a wheelchair. By the time of trial in this cause, Ross testified his condition had improved to the point where he could be out of his wheelchair on occasion and was able to go up and down stairs with the aid of handrails.

The marital difficulties between Ross and Rose culminated when Rose left with her four children. Ross thereafter filed his petition for dissolution in which he claimed Rose had disposed of all of the marital property, thus obviating the need for the court to divide such property, and alleged the birth of the two girls and prayed for their custody. Rose responded by admitting the marriage was irretrievably broken and praying for the custody of the two girls.

Ross tendered evidence designed to show that Rose had virtually wiped out his and his mother's life savings by forging their endorsements to cash in $2,100 in Series E bonds; by withdrawing between $2,000 and $2,500 from a savings account of Ross's mother; by converting $700 from a social security settlement received by Ross's mother; and by writing checks but filling in the check stubs with a lesser amount, thus resulting in overdrafts on Ross's account. Indeed, he was eventually arrested for writing insufficient funds checks, but the charges were dismissed when it was determined that Ross's signatures on the checks were forgeries.

Ross's mother testified that she drove Rose around town to pay various bills, and even though Rose represented the bills had been paid, including those for property taxes and Ross's medical insurance premiums, it later developed they had not. Ross and his mother both testified Rose had taken social security checks to deposit in the bank but instead had secretly obtained cash. There was also evidence that Rose had sold family heirlooms, jewelry and a button collection belonging to Ross's mother. Ross and his mother testified they were required to borrow between $5,000 and $6,000 after Rose left to pay the unpaid bills they thought had been paid by Rose. In addition, Ross introduced testimony from a private investigator designed to show Rose was spending several nights each week with a married man after she left Ross.

In her testimony, Rose denied the financial defalcations alleged by Ross and his mother, and stated that whatever was done by way of signing the name of Ross or his mother on checks or bonds was with their consent. Rose said she took the jewelry, antiques and button collection with the consent of Ross's mother and sold them at her direction. With reference to the difference between amounts shown on check stubs and amounts for which checks were actually written, Rose said the tabs from the grocery store where such checks were generally written were in the grocery sacks and available for inspection.

Rose testified that since leaving Ross she had been living with her grandmother and working as a waitress from 5:30 A.M. to 2:30 P.M. and that her 65 year old grandmother was caring for the children during her absence. After admitting her intimate relationship with a married man, Rose justified it by stating she never left her home until after the two girls born of her marriage to Ross were in bed asleep. She said she visited this man at least three nights a week, but denied taking the two younger girls to his house while he was present. However, Rose did admit taking them there during the day to do some laundry while he was absent.

In contradiction to Rose's admissions, Rose's grandmother testified that Rose lived with her but never stayed out all night. She said she was in good health and was willing to assist Rose in looking after the two small girls. Rose also offered the testimony of her oldest girl, age 9, and this girl's cousin, age 11, that on occasion, when

they had been in the house alone with Ross, he had pointed to various parts of their bodies and asked them to name such parts. Both girls testified that Ross had never requested them to undress or had ever touched them.

At the conclusion of the evidence the trial judge expressed on the record his view of the evidence, first noting he was inclined to believe Rose was immoral, both as to money and personal relationships. As for the testimony of the two girls concerning Ross's interest in their bodies, he felt the testimony was exaggerated but believed there was a kernel of truth. The judge also stated Ross would have difficulty in training and disciplining the girls due to his handicap because he was not able to catch them very easily and the children would take advantage of this situation. The court concluded by stating:

"So I got it on both sides. The Court feels that the probabilities are if they live with their mother, that they may grow up to be immoral and dishonest. If they live with their father, they may grow up to be emotionally damaged because of his handicap. So the Court has decided to place custody in the mother, figuring that's the least likely the damage to be."

Under *Murphy v. Carron,* 536 S.W.2d 30, 32[1–3] (Mo.banc 1976) the judgment of the trial court is to be sustained unless it is against the weight of the evidence, such a finding to be made "with caution and with a firm belief that the decree or judgment is wrong."

The only conflict in the evidence related to Rose's financial manipulation and the trial court resolved it by finding Rose had engaged in the conduct charged by Ross and his mother. Such conduct was not only personally reprehensible, but also possibly constituted violations of criminal law. Moreover, in her personal conduct Rose not only admitted her liaison with a married man, but failed to exhibit any concern over such conduct and gave no indication of discontinuing the relationship. To be sure, the bearing of two other children out of wedlock indicates such immoral conduct was

instinctive with Rose. Her frank admission of nocturnal activities stands in stark contrast to her grandmother's denial.

■ This court accepts the resolution of the factual disputes made by the trial court because of the deference accorded that court as to the credibility of witnesses. *D.I.M. v. P.D.M.,* 548 S.W.2d 237, 239[2, 3] (Mo.App.1977). However, this court cannot agree with the trial court's decision as to the custody of the two small children.

■ On this appeal, the only ground urged by Rose for her to be awarded custody is the well-worn statement that children of tender years, particularly girls, are presumptively better off with their mother. However, such presumption is not conclusive. *In Re Marriage of Carmack,* 550 S.W.2d 815, 818[6] (Mo.App.1977). The true test is the best interest of the child or children. Section 452.375, RSMo 1976 Supp.

■ In determining the best interests of the children, the morals and character of the parent to whom custody is to be awarded are proper objects of inquiry. *Downing v. Downing,* 537 S.W.2d 840, 843[3] (Mo. App.1976). Here the trial court has found Rose to be immoral both as to her honesty and personal conduct, and as to such personal conduct she made no denial and showed no remorse. In her view, engaging in such conduct after her two small children were asleep, although entailing habitual all-night absences, would have no effect on them.

The trial court opined that if the girls were placed with Rose they might grow up to be immoral and dishonest. Based on the evidence this is more than a reasonable apprehension. On the other hand, the trial court felt that placing the children with Ross would cause them some emotional damage. Unlike the possibilities suggested in relation to awarding custody to Rose, the possibility of emotional damage from living with Ross and his illness finds no support in the evidence. There was no evidence whatever concerning potential emotional damage to children resulting from living with a parent confined permanently or partially to

a wheelchair. The evidence was that Ross was able to leave his wheelchair and could go up and down the steps, although admittedly not as fast as an able-bodied person. Furthermore, Ross's mother, who lived with him, stated she was in excellent health and was perfectly willing to assist in rearing these children. Both Ross and his mother will be home full time. The trial court largely discounted the testimony concerning Ross's interest in the older girls. A review of this evidence leads this court also to largely, if not totally, disregard the same.

This court has a firm belief the judgment granting custody to Rose is wrong and against the weight of the evidence and that the best interest of these girls would be served by placing them in the custody of their father. *Murphy v. Carron, supra.*

The judgment is reversed and the cause remanded with directions to the court to enter a decree vesting custody of the two children born of the marriage between Ross and Rose in Ross with provisions for reasonable visitation by Rose.

All concur.