**Janis FREDERICK (Schoonover), Respondent,**

**v.**

**Ricky Kent FREDERICK, Respondent,**

**v.**

**Susan GOTTMAN, Appellant.**

**No. WD 31204.**

Missouri Court of Appeals, Western District.

June 2, 1981.

William Y. Frick, Kirksville, for appellant.

Keith W. Hicklin, Memphis, for respondent Ricky Kent Frederick.

Before KENNEDY, P. J., and PRITCHARD and SWOFFORD, JJ.

PER CURIAM:

This is an action for change of custody of a minor child by motion to modify decree of dissolution. The judgment is affirmed.

Review of this cause is pursuant to Rule 73.01 as interpreted by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). Because no specific request for findings of fact and conclusions of law are made, all fact issues are deemed to be in accordance with the results reached, *Spielberg Mfg. Co. v. Direct Sales Intern., Inc.*, 566 S.W.2d 839 (Mo.App. 1978) and no complaint can lie for the lack of particularity of findings and conclusions absent such requests. *N.J.W. v. W.E.W.*, 584 S.W.2d 148 (Mo.App.1979).

On July 19, 1971, Janis Pickens (hereinafter referred to as the mother) and Ricky Frederick (hereinafter referred to as the father) were married. Of this marriage was born J_____, whose initial custody was awarded to the mother after the marriage was dissolved on July 20, 1972. The father was ordered to pay $40.00 per month child support. The motion giving rise to this appeal was filed by the father on November 3, 1978. The motion sought change of custody from the mother to the father. In filing said motion, the father joined Susan Gottman (hereinafter referred to as the aunt) because she had physical custody of the child. The aunt filed a responsive pleading in which she moved for legal custody of J_____. The aunt alleged she had standing as a proper party pursuant to § 452.485, RSMo Supp.1979.[1]

---

1. Section 452.485, RSMo Supp.1980 reads:
   "*Additional parties.*—1. If the court learns from information furnished by the parties pursuant to section 452.480 or from other sources that a person not a party to the custody proceeding has physical custody of the child or claims to have custody or visitation rights with respect to the child, it may order that person to be joined as a party and to be duly notified of the pendency of the proceeding and of his joinder as a party. If the person joined as a party is outside this state he shall be served with process or otherwise notified in accordance with section 452.460."

■ This court is faced with addressing the question of jurisdiction under § 452.485. Neither party challenged the trial court's jurisdiction, but this issue must be addressed sua sponte if not otherwise contested by the parties. See *Warman v. Warman*, 496 S.W.2d 286 (Mo.App.1973). The aunt possesses no decretal rights as to custody, and under previous authority, she would be vested of no enforceable claim of custody simply by reason of past physical custody. See *In re Duncan*, 365 S.W.2d 567, 4 A.L.R.3d 1270 (Mo. banc 1963); *In re Wakefield*, 365 Mo. 415, 283 S.W.2d 467 (banc 1955) and *Schumacher v. Schumacher*, 223 S.W.2d 841 (Mo.App.1949). In 1967, the Springfield Court of Appeals ruled that the proper procedure in recovering custody from third parties was by a writ of habeas corpus. See *Stockton v. Guthary*, 415 S.W.2d 308 (Mo.App.1967) and *Lipsey v. Lipsey*, 464 S.W.2d 529 (Mo.App.1971).

*Warman*, while pointing out that courts should rule on jurisdiction sua sponte, also declared that where third parties have custody by decree, an adverse trial court ruling accords such third parties the status of "aggrieved parties" for purposes of appeal.

Subsequent to the foregoing authority, the legislature enacted § 452.485. This section permits the trial court to join third parties to the action. Authority which speaks to this statute is *Matter of Trapp*, 593 S.W.2d 193 (Mo. banc 1980). (See also *In the Interest of M___ K___ P___*, 616 S.W.2d 72 [Mo.App.1981], for a discussion of *Trapp*. In this decision, the court found the foster parents did not violate the rule in *Trapp*.) The court in *Trapp* held that foster parents having physical custody of a child have no standing as parties in actions by natural parents to regain custody under Chapter 211. The court in *Trapp* ruled that § 452.485 conferred no rights upon foster parents to intervene in abandonment or neglect proceedings. The court declared at 205:

"We think that § 452.485, V.A.M.S.Supp. 1979, does not confer a right on foster parents having physical custody of a child to intervene in a custody proceeding based on allegations of neglect or abandonment of the child by the natural parents. The provision is designed to confer certain powers on the circuit court, but it does not confer a right to litigate the issue of neglect on persons who are not interested under the terms of the Juvenile Courts Chapter, Chapter 211, RSMo 1978. The right of foster parents are the same under § 452.485, V.A.M.S.Supp.1979, as they were before its enactment."

The underlying policy issue in *Trapp* was the prevention of the interjection of the false issue of foster parent fitness; while the sole issue in Chapter 211 proceedings is the fitness of the natural parents to have custody returned to them.

■ This court interprets *Trapp* to be limited in scope and application to those cases involving foster parents as parties in proceedings pursuant to Chapter 211. This court interprets the state Supreme Court's language in *Trapp* which declares "[t]he provision is designed to confer certain powers on the circuit court" (and read conjunctively with § 452.485) as conferring jurisdiction upon the circuit court to join third persons who have physical custody in proceedings not filed or litigated pursuant to Chapter 211. This court further concludes that the legislative intent and meaning within § 452.485 is to confer jurisdiction upon the circuit court to join third parties who have physical custody of minors and to vest the circuit court with jurisdiction to resolve all conflicting claims of custody in proceedings brought pursuant to § 452.485.

■ This determination should not be construed as having any limiting effect, or as superseding the invocation of jurisdiction by way of a writ of habeas corpus. Rather, this court observes the enactment of § 452.-485 as an alternative method of determining conflicting claims of the custody of minors. Under the facts and circumstances of the instant case, and as a result of this court's application of *Trapp* and the construction placed upon § 452.485, the circuit court herein had jurisdiction to rule the aunt's claim for legal custody.

Although the pleadings formally included the wife, this contest for the custody of J_____ was in reality between the father and the aunt. The mother did not participate at the hearing, although she did support the aunt's claim against the claim of the father.

Through her pleadings and evidence, the aunt challenged the fitness of the father to have the custody of J_____. On this appeal, the aunt charges that the circuit court erred in awarding the custody of J_____ to the father because (a) the court misconstrued and misapplied the law in giving undue weight to the "presumption" that a natural parent's claim to custody is superior to that of any third party, and conversely gave insufficient weight to the matter of the best interest of the minor child; and (b) the court misapplied the law to the evidence by basing its order on a finding that the father was not shown to be unfit, whereas the evidence resolved that the best interest of J_____ would be served in awarding custody to the aunt.

Before taking up and disposing of the issues argued by the aunt, recital of pertinent facts is necessary.

Subsequent to the dissolution of the marriage between the mother and father, the mother entered into two unsuccessful marriages. During this period, J_____ was shuffled between his mother and the maternal grandparents. The mother took up cohabitation with a man not her husband and when the father objected to the exposure of the child to such a situation, J_____ was placed with the maternal grandparents on a permanent basis. Approximately one year later, the maternal grandfather died and J_____ was placed with the aunt and her family. This arrangement continued for approximately two years before the present motion was filed by the father.

During this same period, the father remarried. He and his wife have two children as a result of this marriage. Early in their marriage, the father and his second wife had marital problems and the wife had health problems. However, at the time of the hearing on the motion, both the father and his wife testified that the marital problems and the health problems had been resolved. The father is regularly employed, has a residence which he is willing and desirous of enlarging, matched against a minimal amount of indebtedness. He and his family reside in a rural community and J_____ would attend a rural school. Both the father and his wife expressed a desire to have custody of and to raise J_____.

The aunt and her family live in a larger community, have a residence, J_____ attends a consolidated school, they have provided for him as their own son and both the aunt and uncle desire legal custody of J_____ so as to raise him in their own home.

A great deal of time was consumed at the hearing over the issue of support for J_____. The father contended that he provided child support in the form of cash, money orders and checks, and added that he missed only one or two months payment. In addition, he claimed that since he could not locate the mother for a period of time, he had placed monies in a savings account in lieu of child support payments. In contrast, the aunt contended that she had received only $120 in support of J_____ over a two-year period.

In addition to the issue of child support, visitation was a highly controversial matter tried to the court. The husband testified that following the dissolution, visitation was regularly frequent; but he admitted that it became nonexistent at a later time. The aunt offered evidence that visitation was nonexistent for two years, except for one Christmas. The aunt also testified that the father visited the in-laws in the vicinity of her home, but refused or failed to visit with J_____ on these occasions.

The aunt offered evidence to indicate that she and her husband took a continued interest in the problems and progress of J_____ at school, worked with school authorities and were active in school activities in which J_____ was involved. In contrast, both the aunt and school authorities testified that during this same period, the father took no active role in the problems or activities of J_____ at school.

The aunt contended that in her home, J_____ had his own room and he expressed a desire to retain that room, as contrasted with the fact that he would have to share a room with a step-brother in his father's home. The father countered this evidence with evidence of plans and intentions to enlarge his residence. The court interviewed J_____ and from that interview, it was apparent that J_____ preferred to stay with the aunt, attributing his stay in large measure to having his own bedroom. J_____ also expressed a desire to visit with his parents. When interviewed by the trial judge, J_____ was seven years old. At his birth, his mother was 15 years old and his father, 18 years of age.

At the close of the evidence, the circuit court took the matter under advisement. In awarding the custody of J_____ to the father, the court, in its memorandum opinion summary, found (1) that J_____ had been in the physical custody of the aunt for 16 months; (2) that J_____ was a normal, well-developed child; (3) that J_____ received excellent care from the aunt and her family; (4) that the father and his wife demonstrated to the court their ability to care for J_____; (5) that both (father & wife) were aware of their responsibilities to J_____; (6) that while the evidence did not support the father's claim that he paid all the child support, there was no direct evidence of his failure to make child support payments; (7) that the marital relationship of the father and his wife appeared stable; (8) that the aunt and her family had done an excellent job in providing for J_____, but that the aunt was unable to isolate any complaint regarding the father's care for the son and took the position that she and her husband were in a better position to provide for J_____; (9) that the court under the evidence was convinced that the father was capable of providing for J_____ and that under the law the father must be given the opportunity to do so; and (10) that the evidence failed to support any claim of unfitness of the father and the court suspects the father will be a very good parent for J_____. In support of its finding and conclusion that the father, un-

der the law, must be given the opportunity to provide for J_____, the court cited *In re Wakefield, supra; In Interest of Dimmitt,* 560 S.W.2d 368 (Mo.App.1977); *Ex Parte De Castro,* 238 Mo.App. 1011, 190 S.W.2d 949 (1945); and *Tomlinson v. French Institute of Notre Dame De Sion,* 232 Mo.App. 597, 109 S.W.2d 73 (1937).

A review of the evidence herein reveals conflicting custody claims which, it might be said, are claims by both parties that each is in a superior position to provide for J_____. Although contended by the aunt that the father is unfit, such claim is not supported by the evidence, at least in the classical sense. That is, the evidence on this issue does not show an abusive nature of the father, any excessive habits or any other attending circumstances thought of as inconsistent with the raising of his son. There are conflicting claims which emanate from basic desires to provide for J_____, the father presents to the court his ability to provide for J_____, his awareness of his responsibility and his (along with his wife's) desire to raise J_____. The aunt presents to the court her desire to continue to rear J_____, her proof of past performance of excellent care, and concern for the well-being of J_____. In reality, what the evidence reveals is claimants' contention before the court that each is in a better position to provide for the best interest of J_____. The court would be remiss if it did not recognize the fact that J_____ was found to be in the center of concern of all the parties herein. Unfortunately, as the courts well know, this is a position often envied, but not frequently enjoyed by small children. The court mentions this in the hope that the parties will always emphasize this to J_____, not only so that it will inure positively to his growth and maturity, but so that the respective positions of all the parties will be accurately reflected.

■ This court reviews this case pursuant to Rule 73.01 as interpreted by *Murphy v. Carron, supra.* The aunt charges that the trial court erred in finding that the father was not unfit under the evidence, and conversely that the evidence indicated

that the best interest of J_____ would be served by awarding custody to her. This court cannot agree with the aunt's contention that the evidence fails to support the court's finding. The evidence on the issue of the father's fitness was sufficient to support the court's ruling on this issue, and such ruling was not against the weight of the evidence, *Murphy v. Carron, supra.* Point (b) above is found to be without merit and is ruled against the aunt.

Under the guideline of *Murphy v. Carron, supra,* it must also be determined whether the court erroneously declared the law or erroneously applied it. On this appeal, this is where the aunt directs her allegations of error under (a) above. The aunt argues that the circuit court misconstrued and misapplied the law by giving undue weight to the "presumption" that a natural parent's claim to custody is superior to that of third persons. Contained within that charge against the circuit court is the argument that the court gave insufficient weight to the matter of the best interest of the minor child.

The aunt argues that the determination of custody should be upon the basis of the best interest of the child. Her argument stresses the placing of natural parents on an equal footing with contending third persons. She argues that the natural parent should have no superior claim by reason of natural parentage, and that no presumption should arise to the favor of natural parents. She contends that the best interest of the child test or criteria inherently excludes any preference for natural parents and results in an on-par relationship of the contesting parties to the custody of the minor child. The aunt argues that because of this, the best interest of the child should be weighed absent any necessity of showing the natural parent unfit.

It is this court's impression that the aunt matches the natural parents' position as one test, against the test or criteria of the best interest of the child. Research of prior cases leads this court to conclude that the test or criteria for determining custody is and has always been the best interest of the child. It is when determination of conflicting claims between natural parents and third parties is undertaken that the courts, in support of their awarding custody, have considered and given great weight to the natural or biological relationship between parent and child. This consideration has never been expressed in contravention of the best interest of the child.

To support her argument, the aunt pointed out that early cases showed that in contested claims of mother and father, the children were lodged with the mother under a policy that the children (especially those of tender years) were better off with their mother. She also pointed out that as more and more mothers entered the work force and their social activities broadened, the courts began and continued to consider the granting of custody to the father. The aunt conceded that running parallel to both the early disposition (favoring the mother over the father) and the more recent development (considering custody in the father), there has been a presumption of a superior right to custody in the natural parent over and against third persons. She argues for a departure from this approach and further argues that the case of *G.C.J. v. G.G.,* 510 S.W.2d 193 (Mo.App.1974) supports such departure. The court, in this case, declared at 195,

> "It has been consistently held by our courts that a natural parent has a superior right to the custody of his or her children as against third persons. *In re Wakefield, supra* 283 S.W.2d at 472[7]. This superior right, however, vanishes whenever it is established that the parent is an unfit person or is unable to care properly for the children. (*In re Wakefield, supra* 283 S.W.2d at 472[7] ), since it is the well-being of the children that is our paramount concern."

This court does not reach the same conclusion as the aunt regarding what the court was saying in *G.C.J., supra.* The court was restating the rule that the welfare or best interest of the child has been and continues to be the best interest of the child, and cautioned against exclusive re-

liance upon the natural or biological relationship between parent and child. This same caution was uttered by our state Supreme Court in *In re Shepler*, 372 S.W.2d 87 (Mo. banc 1963), where it reversed and remanded the case for further exploration of the attending facts. In *Shepler*, at 90–91, the court pointed out that the rule in our state is the well-being of the child and emphasized such well-being to be "of paramount consideration. The rights and claims of the contending parties, even in the case of the parents themselves, must be subordinated to what the court may conclude will be for the best interest of the child." The *Shepler* court focused on the employment demands of the father, the behavioral relationship between the father and the children and the lengthy lack of relationship between the father and the children. This court perceives *Shepler* to be a cautionary decision directing the courts in our state not to give undue weight to the biological linkage between parent and child to the exclusion of other facts and circumstances.

■ The aunt argues that there exists a "presumption" in favor of the natural parent. While it is true that our courts have referred to "superior rights" or "paramount rights", see *In re Wakefield* and *G.C.J., supra*, this court remains unconvinced that such is a "presumption" as that term is commonly referenced in our law. Rather, it is an expression favoring the natural parents if there is no showing why they should not prevail. See *Downing v. Downing*, 537 S.W.2d 840 (Mo.App.1976) where parental right is referred to as a "presumption of sorts". The aunt correctly argues that in order to resolve these delicate issues, the requirement of a showing of unfitness has from time to time been invoked.

*Shepler* suggests that the court might be willing to accept other standards additional to unfitness, although the holding is not conclusive on this point. To state it another way, the court in *Shepler*, while using caution in determining the custody question simply upon parental relationship, did not suggest or decide whether a denial of custody to the father would be determined by a

standard of unfitness or might have ascribed some additional standard.

*G.C.J., supra*, reflected an alternative to unfitness when the court included the words (at 195) ". . . or is unable to care properly for the children" within its declaration. What this suggests is a much broader consideration than just unfitness. Moreover, it reflects the court's approach in considering each case upon its own facts and circumstances and the weighing of various factors attending to each case.

Our sister states have struggled with this question and diverse rules have been adopted. These cases include: *De La Hoya v. Saldivar*, 513 S.W.2d 259 (Tex.Civ.App. 1974), which found the father to be fit, but indicated that the children lived with the aunt six years (early development years) and in the best interest of the children, they should remain with her; *People ex rel. Edwards v. Livingston*, 42 Ill.2d 201, 247 N.E.2d 417 (1969) where placement of a child 12 years old with a third person did not require a finding of unfitness of the father; *Bahr v. Bahr*, 60 Mich.App. 354, 230 N.W.2d 430 (1975) where the presumption that the best interest of the child would be served by awarding custody to natural parents is of the strongest order, but is rebuttable upon clear and convincing evidence establishing that the best interest of the child is served and no showing is required to prove parental unfitness, neglect or abandonment; *Gillaspie v. Gillaspie*, 272 N.W.2d 795 (S.D.1978) where a father was denied custody after he filed a stipulation stating that the custody was granted to the grandparents. Here, the evidence failed to show substantial material change warranting custody change. In the *Interest of D.G. v. K.G.*, 246 N.W.2d 892 (N.D.1976) where grandparents were recognized as the "psychological parents"; and *Albright v. Com. Ex rel. Fetters*, 491 Pa. 320, 421 A.2d 157 (1980) where award was made to natural parents after the court declared that natural parents have a prima facie right to custody, meaning that the nonparent bears the burden of persuasion, and that burden is heavy. In addition, the custody dispute

between natural parent and nonparent should not be construed as precluding custody award to a nonparent if there is no demonstration of the parent's dereliction. Such standard seeks only to stress the importance of parenthood as a factor in determining the best interest of the child. However, other factors which have significant impact on the well-being of the child can justify a finding in favor of a nonparent even if the parent is shown to be fit.

While, at the outset, it must be clarified that both the father and the aunt had no motive other than the best interest of J_____, mention must be made of what this court perceives as a potential danger if our courts elect to adopt additional standards or other standards in lieu of those currently employed. The aunt argues that her claim of custody should be viewed free from any favor, or as she phrases it, any "presumption" in favor of the natural parent. If such an approach were adopted (and it is not adopted in the instant case), a danger arises which, for the lack of a better term, could be called "child bidding". Assume, for example, a young couple is married. They bear a child and then their marriage is dissolved. Assume, for various reasons, that neither has the ability to provide a home for their child. The child is placed with the grandparents, an aunt or uncle or perhaps even a neighbor. One or both of the parents may intend for this placement to be temporary pending later establishment of a home environment for the child. Time passes and one or both of the parents is then able and desirous of having the child in a wholesome environment. The physical custodian (i. e., grandparent, aunt, uncle, etc.) resists. The stage is then set for a contest between the parties as to who can provide, and how and why one party can provide for the child more than the opponent. There is little doubt that grandparents, for example, would, in most cases, be more settled and in a better financial position to provide for the child's current and future needs and desires. From this setting, the plans, designs, desires and demands of the nonparent (concerning the child's development) are sharply pitted against the plans, designs, desires and demands of the parents. Now add to this same scene the additional possible situation that original (temporary) placement was made by one of the parents to spite his or her former spouse. The result of such a possible configuration places the court in an almost impossible situation. If best interest is established by current environmental surroundings and future development of the child, and is supported by the comparative financial and social posture of the parties absent any consideration of the biological nexus of parent and child, this court fears a natural parent could never prevail even though he or she possessed the strongest desire to raise, nurture and provide for the child. Our society is designed to reward its members for their diligence and hard work. Coupled with that is the passage of time which permits the senior (as compared with the younger) generation to establish or prove that it is settled into a responsible and socially acceptable life pattern. The result is a comparison of success, achievement, maturity, financial growth and financial superiority. In such circumstances, the possibility arises that the child could become the object of the "bidding process". Motivation for the "bidding" could range from the best of intentions to that of spite.

While many social scholars address the need to consider elements other than or additional to the "biological nexus", it is interesting to this court that none urge totally abandoning the consideration of it. As near as this court can determine, the reasons lies in society's lack of knowledge or understanding concerning to what extent biological relationships play in our total human makeup.

The foregoing, notwithstanding the particular posture of the instant case, finds the aunt alleging and attempting to prove the father unfit. The evidence, as noted by the circuit court, simply failed to prove that allegation. On this appeal, the aunt urges the adoption of a different legal precept than applied by the circuit court. She fails to convince this court of the merits of eliminating the "presumption of sorts" in favor

of the natural parents. In order to afford her relief herein, it must be shown that the circuit court erroneously declared or applied the law. The record shows that the circuit court did neither. *Murphy v. Carron, supra.*

█ This court perceives that the rule in our state is that custody is determined by what is in the best interest of the child. In addition to that rule, there has been and continues to be two recognized tests to determine the parental right to custody. These two criteria are unfitness and the inability to provide for the child. *G.C.J., supra.* This court is not desirous or prepared to suggest abandonment of the "parental right" doctrine within the issue of custodial claims between natural parents and third persons based upon limited sociological and psychological data which by its nature leaves unanswered the impact or importance of the biological or natural nexus between parent and child. This is to say that under given facts and circumstances, elements additional to unfitness and inability to provide for the child could at some future date be presented to our courts. Such additional elements could and perhaps should be included within the "best interest test" so long as proper safeguards are erected simultaneously to guard against such things as "child bidding" as discussed herein.

This court has endeavored to address a concern best summarized in the case of *Callaway v. Callaway,* 590 S.W.2d 700, 702 (Mo.App.1979) wherein the court concluded, "In their exceptionally well constructed and literate brief, the appellant argues the child should not be removed from the proven environment of the grandparents to the untested environment of the mother. However, if this argument was controlling an errant but repentant and re-established parent could never, in the absence of deterioration of the custodial environment, regain custody of his or her child. This cannot be controlling."

█ Not only does this court embrace the language and intent expressed in *Callaway, supra,* but it recognizes it as a statement of the present posture of the law in our state.

It must follow, pursuant to *Murphy v. Carron, supra,* that the circuit court herein neither erroneously declared or applied the law.

As previously noted, the aunt and her family have exhibited to this court a remarkable compassion for the welfare of J_____. Such motivation should not go unrecognized and it is satisfying to this court to observe such unselfishness. This court has, at the same time, the responsibility to recognize the posture of the law and the reasons therefor, and to evaluate the evidence of particular litigation in light thereof. In meeting that responsibility in the instant case, this court cannot conclude any error in the declaration or application of the law by the circuit court, *Murphy v. Carron, supra,* and as a result thereof, point (a) above is ruled against the appellant.

For the reasons set forth herein, the judgment is in all respects affirmed.