Kenneth Wayne JOHNSON, Appellant,

v.

Janice Coleen JOHNSON, Respondent,

and

Joan and Andrew Loulos, Amici Curiae, Respondents.

No. WD 32253.

Missouri Court of Appeals,
Western District.

Feb. 9, 1982.

Christopher C. Marsh, Independence, for appellant.

Robert C. Paden, Independence, for Janice Coleen Johnson; Paden, Welch, Martin, Albano & Graeff, Independence, of counsel.

Richard J. Koury, II, Independence, for Andrew and Joan Loulos.

Before TURNAGE, P. J., and PRITCHARD and KENNEDY, JJ.

PRITCHARD, Judge.

In this dissolution of marriage proceedings, the first issue is the propriety of the trial court's order awarding custody "until the further order of the court", of three minor sons born of the marriage, to the maternal grandparents, Joan and Andrew Loulos, the Amici Curiae-respondents. The order provided that appellant (Ken) have reasonable and specific visitation privileges with the children upon reasonable notice, including but not limited to alternate weekends from 6:00 p. m., Friday, to 6:00 p. m., Sunday, beginning October 31, 1980, and that the mother (Janice) have reasonable visitation privileges in the home of the grandparents. Although Janice asked for custody in the trial court, where she testified that if she did not get it, she preferred that the Loulos have the custody rather than appellant, she did not appeal.

Ken and Janice were married on July 10, 1971, and the three sons were born on these respective dates: November 16, 1972; May 21, 1974; and July 11, 1977. On June 14, 1979, after some stormy times, Janice left the family home and began living separate and apart. She admitted to extramarital relations with several men during the marriage and there was evidence that Ken was aware of them and made no objection. Ken filed the petition for dissolution on December 12, 1979, and made amendment thereto on August 28, 1980, asking for custody of the children. Trial began on September 3, 1980, and lasted about a week, resulting in two volumes of the transcript.

In brief, by his first point, Ken attacks the order of custody saying that none of the parties overcame the presumption that children should be placed with a natural parent; that there was no showing that he was unable to care for the children, or that he was unfit or incompetent to do so; that the order was against the weight of the evidence in that it showed he took adequate, proper care of them, and had an excellent relationship with them; and that the maternal grandparents were unable to provide adequate and proper care for them and had a poor relationship with them.

On the issue, the facts are these: Ken produced witnesses whose testimony tended to show that he did not mistreat the children; he kept them clean and took care of their daily hygiene needs; his relationship with the children was excellent; and he provided good living conditions for them and a proper diet and adequate and proper medical care. He produced one witness, who baby-sat with the children for a time in her home, who testified that the maternal grandparents never did indicate to her that the children were not being properly cared for. Ken testified that the children did not want to go visit with the maternal grandparents, who, after baby-sitting for two or three days, told him they could not handle it any more. Although appellant says the testimony of Joan Loulos indicates they were unable to discipline the children, all that it does show is that it presents a problem.

Ken relies upon the "Custody Report" of a deputy juvenile court officer, who was ordered by the court to make investigation

of all parties involved, the report being admitted into evidence by stipulation. On the officer's first visit, August 9, 1980, Ken and Janice were in the home, at which time the house was in rather poor condition. The living room furniture was adequate but was on loan from Ken's relative, a sofa cushion was filthy. The two bathrooms were in poor condition, one lacking a toilet seat for many months, and the stools were heavily stained on the inside. The basement was particularly bad, its foundation leaking, but one portion, Ken's study, was in excellent condition, only upon which, according to Janice, Ken spent time and money and neglected other parts of the house. On the second visit, August 14, 1980, the house was in considerably better shape, being clean and neat, and some painting had been done. On the third visit, August 18, 1980, much of the house was found to be painted, remodelling of the bathrooms had progressed, a new toilet seat had been installed for the one missing, and a fiberglass shower kit had been installed over one of the tubs. [According to Joan's mother, Opal Yokum, Andrew Loulos bought materials and fixed the kitchen sink and bathtub drain, unstopped the kitchen sink, lavatory and the two stools, and purchased the toilet seat.]

The older child was physically healthy. The next child became pigeon-toed in early years, and leg braces were prescribed, but the mother kept taking them off until she left in June, 1979, to February, 1980, during which time the braces were worn. The youngest son had digestive problems and a "wandering eye" which would require exercises. He was very insecure, had a phobia toward water, and he was in panic and screamed when either of his parents departed. The officer recommended that the children be placed with Ken with adequate visitation rights to Janice and her parents, and with supervision by the Division of Family Services to monitor conditions in the home for the first six months. The investigating officer interviewed the children separately, and the two older boys expressed their desire to him to stay with Ken. The officer noted that the two older boys' use of

almost the same words in describing what they wanted led him to suspect that they were "primed", but he went on to say that one could see they have a genuine love for their father and were used to spending a lot of time playing with him. The older son, age eight, with counsel present, told the trial court in chambers that he would rather stay with Ken because he played with him a lot and took him to ball games but gave no other reason other than he did not like to stay with the maternal grandparents.

In the year prior to August, 1980, Ken spent over $600.00 on his personal books, magazines, camera equipment, and albums, money which Janice said could have been used on house repairs and living expenses. According to her, although she admitted dereliction in caring for the children's medical needs while there, Ken gave her no funds for cleaning equipment, and she was incapable of making repairs.

Photographs of the interior of the home, taken by Andrew Loulos in middle 1980, showed it to be in a state of disarray and need of repairs. Especially appearing bad were the baths, plumbing equipment, tiling and floor coverings. The basement, except Ken's area, was in chaos. After some repairs, either made by Ken or Mr. Loulos, or jointly, photographs taken by Ken the day before trial, showed improvement of some of the areas.

Ken testified that the six year old son was still in diapers at night, being afflicted with nocturnal enuresis, a bed-wetting problem. [According to Mrs. Loulos, this child also had problems with his stools and had to be cleaned after a bowel movement.] He admitted having disciplinary problems with the children, and that he hit them with a belt, and spanked them. Although he thought that the Loulos were domineering and strict and too tied-up with their church, he admitted that there was nothing wrong with them except that they were not the natural parents of the children.

Janice admitted her several infidelities during the marriage, and testified that Ken knew of them, and even accepted repair

services without charge from some paramours. She was the one who took the youngest son in April, 1979, to the doctor for his serious diarrhea, and there was further evidence that this disorder was a recurring problem. This son was neither toilet-trained nor weaned at the age of three years. Ken had on one occasion thrown Janice against the bed and bruised her chest from her neck to her waist. Apparently Janice lived in the home from February, 1980, up to the time of trial, but she was gone frequently. Her parents had stayed out of her life and the lives of the children prior to the last year. She saw her mother as being just a determined person, not domineering.

Joan Loulos testified that she and Andrew had little contact with the children prior to Ken and Janice's separation in 1979, but since then it has been almost on a daily basis. She identified the photographs taken by Andrew as showing the chaotic condition of the house between June, 1979, and fairly recently. The house was not clean, and many repairs had not been made. The children were getting junk food—bologna sandwiches, Pepsi, potato chips, cookies and cakes, and she saw the 3 year old drinking Pepsi Cola from his baby bottle. After Janice returned to the home in February, 1980, she was cooking, and the grandparents carried in much of the food she cooked, Joan's mother fixed the children's breakfast many times, carrying it in and out. Sometimes there was no food for lunch, and they would take it in during the summer of 1980. In December, 1979, Joan suggested to Ken that the children needed dental care, but he went to have his own teeth checked and did not take the children. Besides the youngest son's diarrhea, all of the children had flu, colds and congestion. She had the two older boys for a week in 1979 when they had a 104° temperature. She purchased all medical prescriptions except two, and she took the children to the doctors.

Joan denied that she showed no affection for the children, and testified that she held them, kissed and caressed them. Her idea of discipline was to cause an erring child to sit in a chair for no more than thirty minutes. She always told the children that Ken loved them.

Joan was Sunday School Superintendent of her church and was co-editor of its magazine. The church office was in her home, and she spent 4 hours a day in her duties, most of it in the evening, and she could do that work and take care of the children. The Loulos have the facilities to care for their children in their three bedroom home with partially finished basement with a bath where the children could play. One 14 year old daughter is still in their home. The children would go to either a private or public school, a bus picking them up in front of the home for transportation to the latter. Joan would transport them to and from a private school. The children would attend church with the Loulos. She had seen Ken keep hitting the older boy with a belt saying. "I'm going to keep this up. until you bend over and grab your ankles. * * * Ten whacks." She saw the youngest son in December, 1979, lying on his bed "urine soaked from head to foot, his hair was completely soaked with urine." She and Andrew are capable and prepared financially to care for the children until the parents are able to do so.

Joan's mother, Opal Yokum, assisted her and Andrew in taking care of the children from June 4, 1979, to after January, 1980. She described the condition of the home as one of cruddiness, one of poverty. Some of the plumbing did not work. The kitchen pipes did not work, and water was caught in a pan. Only the cold water worked in the bathroom. There were no fixtures on the walls to hold towels, toilet tissue or toothbrushes. There were no seats on the toilets. The divan was in terrible condition, and phones continually fell on the floor. The children were sleeping on a twin-size, urine-soaked mattress. The chairs in the front room were in broken-down condition. The Loulos purchased clothing for the children so they could go back to school, and Joan and Opal altered clothing to fit them.

■ ■ There is a presumption, as appellant says, that, absent proof to the contrary, that the best interests of minor children are best served by awarding custody to a parent. *Matter of C_____ W_____ B_____,* 578 S.W.2d 610, 614[3, 4] (Mo.App.1979), and cases cited, but the presumption is not conclusive, and that case goes on to say that the presumption vanishes when it is established that the parent is an unfit person or is unable to care for minor children. [Note, however, the case of *Frederick v. Frederick,* 617 S.W.2d 629, 635[6] (Mo.App.1981), where it is said that the "presumption" is not a term commonly referenced in our law, but it is rather an expression favoring the natural parents if there is no showing why they should not prevail.]

■ Here, the evidence conflicts as to appellant's history in providing the three boys with a suitable home environment, adequate medical and dental care, clothing and proper discipline. In that circumstance, the resolution of the conflicts and the determination of the credibility of the witnesses will be left to the trial court, and deference will be accorded its conclusions. *L.H.Y. v. J.M.Y.,* 535 S.W.2d 304, 306 (Mo.App.1976), and cases cited. In this connection, the trial court was not required to accept the "Custody Report" of the deputy juvenile officer, although it is generally favorable to appellant, considering, as the trial court was entitled to do, the fact that the investigating officer saw the home environment and parties three times as contrasted to other witnesses (Mrs. Loulos and her mother) who observed the situation over many months. See *Johnson v. Johnson,* 526 S.W.2d 33, 36[4, 5] (Mo.App.1975).

■ The trial court could have believed that there was a disciplinary problem in the home, and that the maternal grandmother's discipline in making an errant child sit in a chair for a time, was superior to appellant's use of a belt. Although dental care for the children was suggested, none was given, but appellant had his own teeth fixed. The children were frequently ill, and medical care and medicine were supplied by Mrs. Loulos. The trial court could believe that it was she who supplied them with proper clothing. Although the condition of the home might be attributed in part by the neglect of the mother, appellant had charge of it when she left the home. Repairs were not made to the plumbing, floors, and walls, although appellant was able to spend over $600 on his personal enterprises in a year. The trial court was entitled to conclude that the general condition of the home while appellant had exclusive charge of it was one of wretchedness and filth. Proper food was not supplied them. These conditions contrast with the home environment that the Loulos are able to provide, and there is no evidence that they are unable to do so. The presumption that appellant was the proper custodian of the children has been overcome on these facts in their best interests. The order is not against the weight of the evidence, and there is no firm conviction that it is wrong.

■ By Point II, appellant contended that the trial court erred in excluding evidence of out-of-court utterances by the children. The basis for the objection to the evidence was that it was hearsay. Appellant attempts to bring the matter within the res gestae exception to the hearsay rule, and apparently consisted of statements made by the children after they visited in the home of the maternal grandparents. There was no offer of proof as to any statements or the circumstances in which they were given, as for instance, spontaneously or in answer to interrogation, and thus the trial court may not be convicted of error in rejecting them. Whether statements are admissible into evidence as part of the res gestae is a matter within the trial court's discretion. *Kuzuf v. Gebhardt,* 602 S.W.2d 446, 452 [11, 12] (Mo. banc 1980). Besides, even if any such statements were derogatory toward the grandparents, the trial court would not be bound by them, even under the evidence that these children, being of tender years, expressed wishes to be with appellant, but the court could consider all of the evidence as bearing upon their best interests. The point is overruled.

Lastly, appellant contends that the court erred in quashing a subpoena duces tecum directed to Joan Loulos requiring her to produce "1978 and 1979 Income Tax returns, June and July paycheck receipts and/or stubs, bank account books, and any documents evidencing ownership of stocks and bonds, and employment work schedules and work records submitted for May, June and July, 1980." Apparently, appellant desired to show that Joan's work would make her unable to care for the children, contrary to her testimony. The subpoena is overly broad, as not being limited to the work records. Thus, the trial court did not err in quashing it because it was unreasonable and oppressive under Rule 57.09(b). The last point is overruled.

The judgment is affirmed.

All concur.